# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued February 7, 2006        Decided July 7, 2006

No. 04-3174

UNITED STATES OF AMERICA,
APPELLEE

v.

MORRIS M. BROADIE,
APPELLANT

Appeal from the United States District Court
for the District of Columbia
(No. 04cr00218-01)

*Lisa B. Wright*, Assistant Federal Public Defender, argued the cause for appellant. With her on the briefs was *A. J. Kramer*, Federal Public Defender. *Neil H. Jaffee*, Assistant Federal Public Defender, entered an appearance.

*Florence Pan*, Assistant U.S. Attorney, argued the cause for appellee. With her on the brief were *Kenneth L. Wainstein*, U.S. Attorney, and *Roy W. McLeese, III* and *David B. Goodhand*, Assistant U.S. Attorneys.

Before: GINSBURG, *Chief Judge*, and HENDERSON and RANDOLPH, *Circuit Judges*.

GINSBURG, *Chief Judge*:   Morris Broadie challenges his conviction and sentence for unlawful possession with intent to distribute more than 50 grams of cocaine base, a violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(iii).   He argues the drugs and cash found in a hidden compartment in his van should have been suppressed because police officers detained him without a reasonable, articulable suspicion or, alternatively, because they arrested him without probable cause, based solely upon seeing he had an "ASP baton."   We reject Broadie's claims and affirm his conviction but, as agreed by the parties, remand the record to the district court to make a sentencing determination pursuant to *United States v. Coles*, 403 F.3d 764 (D.C. Cir. 2005).

## I.  Background

The undisputed police testimony is as follows.   At approximately 11:40 one night three officers of the Metropolitan Police Department were driving through a "high drug area, known for the illicit sale of crack cocaine [and] marijuana" and for the recovery of "numerous weapons," when they got out of their car to talk with some men they had stopped the previous night for being drunk in public.   Officer Derek Phillip noticed that a conversion van, parked on the street two to three car lengths away, was idling the whole time they spoke -- three to four minutes.   Believing the van was idling excessively, in violation of D.C. Municipal Regulations title 18, § 2418.3 (idling limited to three minutes when vehicle is parked, except for "private passenger vehicles"), the officers proceeded to investigate.

Officer Phillip approached the passenger door of the van and shone his flashlight through the window, which was "heavily tinted."   He saw Broadie "slumped over the wheel," apparently sleeping.   Phillip tapped the window 15 to 20 times

and tried to open the passenger door, but it was locked. When Broadie finally woke up after about 30 seconds, he was "disoriented," looked "confused" and, in Officer Phillip's opinion, "could have been under the influence" of alcohol or drugs. Officer Teel, standing by the driver's side of the van, directed Broadie to get out.

At this point the stories told by the police and civilian witnesses diverge. Officer Phillip testified at the suppression hearing that as Broadie got out of the van, Officer Teel observed in plain view in the pocket of the driver's side door an ASP baton -- a "newer version of the nightstick" that, "by the use of a little arm movement, ... protrudes out to 16 inches"; it is used by law enforcement officers to "subdue combative subjects." Officer Teel then handcuffed Broadie and placed him under arrest for "possession of a prohibited weapon," *see* D.C. Code § 22-4514, after which he "thoroughly" searched the van.

Rondell Wills, one of the four men stopped by the police, and Tarsha Washington, a neighbor who saw the encounter from her porch, remembered the incident in a slightly different way. They testified at the hearing that the officer on the driver's side of the van opened the door and "snatched" or "pulled" Broadie out, took him to the back of the vehicle, and placed him in handcuffs. Only then did an officer -- their testimony conflicts as to which one -- return to the driver's door where he leaned down and appeared to be "searching for something." When the officer emerged from behind the door, he held up a "black stick," presumably the ASP baton.

In the course of their post-arrest search of the van, the officers found beneath a beverage compartment at the rear of the vehicle (1) a clear ziploc bag containing "51 small green-tinted ziplocs with a white rock-like substance" as well as "loose

white-rock" wrapped in saran wrap, (2) a separate green-tinted bag, and (3) $600. When Broadie was later indicted for unlawful possession with intent to distribute more than 50 grams of cocaine base, *see* 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(iii), he moved to suppress the physical evidence found in his van, arguing the police had neither reasonable suspicion to detain nor probable cause to arrest him.

The district court denied the motion, crediting Officer Phillip's version of events insofar as there were factual discrepancies in the testimony. The court concluded the officers reasonably could have believed that Broadie was "ill," "suffering from carbon monoxide poisoning," or "intoxicated," and therefore they lawfully ordered him from his vehicle in order to "find out if [he was] all right" and to "protect the public" from a potentially drunk driver. The court also held the search of Broadie's car was a lawful search incident to arrest because the officers had probable cause to believe Broadie's possession of the ASP baton violated D.C. law.

Broadie entered a conditional plea of guilty, thereby preserving his right to appeal. The district court sentenced Broadie to 121 months in prison, the low end of the Sentencing Guidelines range, followed by five years of supervised release.

## II. Analysis

Broadie argues again on appeal that the physical evidence found in his van should have been suppressed as the product of a seizure and an arrest made in violation of the Fourth Amendment to the Constitution of the United States. We review *de novo* the district court's determinations of reasonable suspicion and probable cause but review its findings of fact only for clear error. *See Ornelas v. United States*, 517 U.S. 690, 699

(1996).

A.  The Seizure

First, Broadie argues he was unlawfully seized when the officers directed him to get out of his van without having a reasonable, articulable suspicion that "criminal activity may be afoot." *Terry v. Ohio*, 392 U.S. 1, 30 (1968); *see United States v. Edmonds*, 240 F.3d 55, 59 (D.C. Cir. 2001) ("the issue is whether a reasonably prudent man in the circumstances would be warranted in his belief that the suspect is breaking, or is about to break, the law") (internal quotation marks and citation omitted).  The Government advances three rationales for the seizure:  the officers (1) could reasonably have suspected Broadie had been driving or would drive while intoxicated, (2) could reasonably have suspected the heavy tint on Broadie's windows violated D.C. law, and (3) in any event were acting pursuant to their "community-caretaking" duties because they had a "duty to determine whether [Broadie] was ill, injured or intoxicated," *see Cady v. Dombrowski*, 413 U.S. 433, 441 (1973).  Because we agree with the first point, we do not address the other two.

"Reasonable suspicion" is a "less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000).  Therefore, a *Terry* stop "requires only a minimal level of objective justification and an officer may initiate one based not on certainty, but on the need to 'check out' a reasonable suspicion." *Edmonds*, 240 F.3d at 59 (internal quotation marks and citations omitted).  The inquiry requires an assessment of the "totality of the circumstances as the officer on the scene experienced them." *Id.*

Considering the totality of those circumstances, we conclude the officers could reasonably have detained Broadie based upon the reasonable suspicion that he had been or soon would be driving while intoxicated. Broadie was found "slumped over" his steering wheel, with his engine running, late at night. As the district court reasoned, "generally people are not [found in such a position] unless something is amiss." Broadie was slow to awake and his "disoriented" and "confused" state when he did wake up would only have heightened a reasonable observer's suspicion he was intoxicated.

Broadie protests it is mere speculation that he might have been intoxicated, for the circumstances suggested he was simply asleep. "Our inquiry, however, 'does not deal with hard certainties, but with probabilities.'" *United States v. Moore*, 394 F.3d 925, 930 (D.C. Cir. 2005) (quoting *United States v. Cortez*, 449 U.S. 411, 418 (1981)). And that Broadie was intoxicated "was among the most probable explanations for the peculiar circumstances [Officer Phillip] observed." *Id.* We conclude the police had a reasonable, articulable suspicion upon which to detain Broadie.

Having lawfully detained Broadie, it follows that the officers reasonably could, in the interest of their own safety, order him to get out of his van. *See Pennsylvania v. Mimms*, 434 U.S. 106, 111 (1977) ("We think this additional intrusion can only be described as *de minimis*. ... The police have already decided that the driver shall be briefly detained; the only question is whether he shall spend that period sitting in the driver's seat of his car or standing alongside it."). We turn, therefore, to the question whether they had probable cause, moments later, to arrest him.

B.  The Arrest

As an initial matter, Broadie maintains the police lacked probable cause because they found the ASP baton after, not before, they arrested him.  Specifically, he argues the district court clearly erred in crediting the testimony of Officer Phillip over that of Broadie's civilian witnesses, whose testimony, he claims, shows the baton was found after he had been pulled from the car and handcuffed.  Relatedly, Broadie says the police must have "staged" the photograph in the record showing the ASP baton sticking out of the pocket on the driver's side door in plain view.

We review the district court's credibility determinations only for clear error.  *United States v. Simpson*, 992 F.2d 1224, 1226-27 (D.C. Cir. 1993).  Indeed, such rulings "are entitled to the greatest deference from this court on appeal." *United States v. Hart*, 324 F.3d 740, 747 (D.C. Cir. 2003) (citation omitted); *see also United States v. Anderson*, 881 F.2d 1128, 1142 (D.C. Cir. 1989) ("credibility determinations ... are not for us to second guess").

Broadie attacks Officer Phillip's testimony on two fronts.  First, he argues the timing of events described in police testimony and police reports conflicts with the dates on the photographs taken at the scene with Officer Jonathan Teixeira's digital camera.  The photograph of the drugs found in the van was dated "4/13/2004," but the photograph of the baton sticking out of the pocket of the driver's door was dated "4/14/2004." Officer Phillip explained the discrepancy, testifying it was "fair to say" the photograph of the ASP baton was taken after midnight.  According to Broadie, however, the officers described a different sequence of events in their own reports and testimony, as follows: (1) they stopped to talk to four men at

11:40 p.m.; (2) they arrested Broadie at 11:43; (3) after the van had been searched, they photographed the drugs and the baton, which took a "few minutes"; and (4) they read Broadie his rights at 11:45. Broadie argues this sequence is inconsistent with Officer Phillip's explanation that the photograph of the ASP baton was taken after midnight; therefore the district court should not have credited Officer Phillip's testimony that the baton was in plain view when he was arrested at 11:43.

The district court concluded that discrepancies of "a matter of minutes" were not significant: They may have been the result of faulty memories, lack of precision in the police reports, or a camera with an internal clock running a little fast. In sum, the court found that any inconsistency is not "so glaring that the police officers' testimony 'must be a fabrication.'" *United States v. Streater*, 70 F.3d 1314, 1318 (D.C. Cir. 1995) (quoting *United States v. Gilliard*, 847 F.2d 21, 24 (1st Cir. 1988)). This decision, though not compelled, is certainly not clearly erroneous.

Broadie also challenges the district court's reasons for discrediting his witnesses. The court found Mr. Wills was evasive and inconsistent about his relationship with Broadie and that certain aspects of his testimony simply did not jibe. The court also found Ms. Washington's version of events problematic ("I just don't think that is reasonable"). Broadie argues the court did not "hesitat[e] to conclude that [the defense witnesses] had lied under oath based on the smallest of perceived discrepancies." But the court never suggested a witness was lying; the judge merely concluded Officer Phillip was more credible. As the Government points out, the discrepancies could have been due to mere mistake or a failure of recollection on the part of Broadie's witnesses.

It is also likely Wills and Washington simply could not see well enough to assess the order of events; Officer Phillip testified that Teel saw the ASP baton before he arrested Broadie, specifically, "As he [Broadie] exited the vehicle." If, as seems to be the case, the baton was in plain view immediately upon Broadie's opening the door, then Officer Teel's quick reaction may well have appeared to an observer as his simply pulling Broadie from the car and arresting him. The witnesses could not tell whether he spotted the baton before or after he laid a hand on Broadie; nor did they claim to have done. Therefore, their testimony gives us no basis upon which to disturb the district court's decision to credit Officer Phillip's testimony that Teel saw the ASP baton in plain view before he arrested Broadie.

Broadie's challenge to his actual arrest is more weighty. He argues the search of his van was not a lawful search incident to arrest, pursuant to *New York v. Belton*, 453 U.S. 454 (1981), because the police, assuming they had seen the baton, still did not have probable cause to arrest him for possession of a prohibited weapon under D.C. Code § 22-4514(b), one of the crimes with which Broadie was actually charged. The Government concedes this point, as it must. For we explained in *United States v. Christian*, 187 F.3d 663 (1999), a violation of § 22-4514(b) requires proof of intent "to use [the weapon] unlawfully against another," and there is at least one "perfectly lawful purpose for keeping a [weapon] in a car, particularly in a high-crime neighborhood: self-defense." *Christian*, 187 F.3d at 667.

The arrest was valid, however, if the officers had probable cause to believe Broadie had committed any crime. *See Devenpeck v. Alford*, 543 U.S. 146, 153 (2004) (officer's "subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause").

And this they had.

The Government argued before the district court that the facts provide probable cause to believe Broadie was carrying a dangerous weapon (CDW) in violation of D.C. Code § 22-4504(a), which does not require proof of intent to use the weapon for an unlawful purpose. *See Mitchell v. United States*, 302 A.2d 216, 217 (D.C. 1973); *see also Roper v. United States*, 564 A.2d 726, 730 (D.C. 1989) ("It is essentially a crime of possession, designed to keep such dangerous items off the street"); *Scott v. United States*, 243 A.2d 54, 56 (D.C. 1968) (noting congressional intent "to drastically tighten the ban on carrying dangerous weapons"). Therefore, neither self-defense nor any other "lawful purpose" is material to the offense or sufficient to avoid liability. *See Monroe v. United States*, 598 A.2d 439, 440 (D.C. 1991).

In the District of Columbia, a "dangerous weapon" is anything that is "*likely* to produce death or great bodily injury by the use made of it." *Strong v. United States*, 581 A.2d 383, 386 (D.C. 1990) (quoting *Scott*, 243 A.2d at 56). An object is "likely to produce great bodily injury" if: (1) the design of the object is such that in its ordinary use it is likely to cause great bodily injury; or (2) the surrounding circumstances indicate that an object capable of causing great bodily injury is likely in fact so to be used. For example, some items, "such as particularly menacing knives, have been held to be inherently dangerous," *id.*, that is, "dangerous in its ordinary use as contemplated by its design and construction," *Scott*, 243 A.2d at 56. But "all knives are not per se dangerous .... [because a] knife may be used as a tool in certain trades or hobbies or it may be carried for utilitarian reasons." *Id.* An object that is not "inherently dangerous can become dangerous by its use as a weapon." *Strong*, 581 A.2d at 386; *see also Scott*, 243 A.2d at 56 (an

instrument may be dangerous "where the purpose of carrying the object, under the circumstances, is its use as a weapon").

In order to determine whether the CDW statute outlaws the carrying of "an otherwise useful object" we must examine "the surrounding circumstances," *Scott*, 243 A.2d at 56, including, among others, "the design or construction of the instrument; the conduct of the defendant prior to his arrest; any physical alteration of the instrument; and the time and place the defendant was found in possession." *Monroe*, 598 A.2d at 441 (citations omitted). Note that the design of the instrument is relevant to both inquiries: It may indicate an object is inherently dangerous or, if not inherently dangerous, that the object is likely to be used as a weapon.

The Government argues we need not consider the alternative because Broadie conceded before the district court that an ASP baton is an inherently dangerous weapon. Although defense counsel did say, "An ASP baton is a dangerous weapon," he qualified his statement, adding "just as a knife, for instance, is a dangerous weapon." And, as just discussed, not all knives are inherently dangerous weapons for the purpose of § 22-4504 because not all knives are designed to cause great bodily injury in their normal use. In context, there is no reason to believe Broadie's counsel was, with this statement, conceding away his entire defense. Therefore, we understand counsel to have conceded only that an ASP baton, like a knife, is capable of being used as a dangerous weapon. And just "as [with] a knife," the Government must establish probable cause to believe the suspect intended to use the ASP baton to cause great bodily injury.

Still seeking a short cut, the Government argues evidence in the record establishes that the ASP baton is inherently

dangerous. The scant record evidence regarding the baton, however, does not support this claim. Officer Phillip testified that the baton is "primarily used to subdue combative subjects" but, unsurprisingly, he not did not say or even imply that officers ordinarily inflict great bodily injury when they use the device. Indeed, what little authority there is on the matter suggests an ASP baton is designed so it "can be used to control suspects without inflicting serious injury." *Armament Sys. & Procedures, Inc. v. Monadnock Lifetime Prods., Inc.*, 168 F.3d 1319, 1998 U.S. App. LEXIS 20818, at *1-2 (Fed. Cir. Aug. 7, 1998).

That said, it does not require authority to conclude that a 16-inch steel rod -- like the more commonplace lead pipe -- is capable of inflicting great bodily injury when used for that purpose. Therefore, the relevant inquiry is whether the surrounding circumstances provide probable cause to believe Broadie intended to use the ASP baton to cause great bodily injury, whether in self-defense or otherwise. We believe they do. *See Brinegar v. United States*, 338 U.S. 160, 175 (1949) ("In dealing with probable cause ..., as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.").

Although many objects capable of causing great bodily injury, such as a lead pipe, have legitimate uses other than as a weapon, the normal and the only apparent use of an ASP baton -- a steel rod that may be extended with a flick of the wrist -- is to strike another. As *Armament Systems* attests, an ASP baton "can be used to control suspects without inflicting serious injury"; but a reasonable officer surely would believe that a civilian, presumably without police training, would likely inflict great bodily injury when using a steel rod in self-defense.

Indeed, of all people a police officer specially trained in the use of an ASP baton is the most likely to know just how dangerous the baton may be in the hands of an untrained person.

In sum, we hold the officers had probable cause to believe that Broadie, encountered late at night in a high-crime area, having within arm's reach a weapon designed to be used against another person, intended to use it so as to inflict great bodily injury. Therefore, Broadie's arrest was valid. It follows that the search of Broadie's van incident to that arrest was also valid and the district court properly declined to suppress the evidence it turned up.

## III.  Conclusion

For the foregoing reasons, Broadie's conviction is affirmed. As for his sentence, the parties agree a remand is required. In *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court held the United States Sentencing Guidelines are advisory only. Broadie claims the district court plainly erred by applying the Guidelines as though they were mandatory. Because the record is unclear as to whether the district court "would have imposed a different sentence, materially more favorable to the defendant, had it been fully aware of the post-*Booker* sentencing regime," we remand the record for the district court to make this determination. *See Coles*, 403 F.3d at 771.

*So ordered.*