# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued December 10, 2009       Decided February 5, 2010

No. 07-3125

UNITED STATES OF AMERICA,
APPELLEE

v.

SAMUEL H. VINTON, JR.,
APPELLANT

———

Appeal from the United States District Court
for the District of Columbia
(No. 06cr00298-01)

———

*Beverly G. Dyer*, Assistant Federal Public Defender, argued the cause for appellant. With her on the briefs was *A. J. Kramer*, Federal Public Defender. *Neil H. Jaffee*, Assistant Federal Public Defender, entered an appearance.

*James M.* Perez, Assistant U.S. Attorney, argued the cause for appellee. With him on the brief were *Roy W. McLeese III* and *Mary B. McCord*, Assistant U.S. Attorneys.

Before: BROWN and KAVANAUGH, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the court filed by *Circuit Judge* BROWN.

BROWN, *Circuit Judge*: Samuel Vinton, convicted of narcotics and firearm offenses after the contraband was found in a briefcase in his car during a traffic stop, appeals the denial of his motion to suppress. He argues the evidence was discovered during an unconstitutional search of his vehicle and property. In particular, he contends that *Arizona v. Gant*, 129 S. Ct. 1710 (2009), decided by the Supreme Court while this appeal was pending, establishes that the search of the briefcase cannot be upheld under the search-incident-to-arrest exception to the warrant requirement. Because it was "reasonable to believe" evidence relevant to Vinton's weapons-possession offense would be found inside the briefcase, we affirm.

I

On September 9, 2006, around 9:00 p.m., U.S. Park Police Officer William Alton, driving a marked cruiser in Southeast D.C., saw a green Nissan Maxima speeding, and also observed that its windows were excessively tinted. Tr. of Mot. Hr'g at 6, 8, 69, *United States v. Vinton*, No. 06-cr-298 (D.D.C. Feb. 9, 2007) (Suppression Tr.). As Alton followed the car, he noticed "a thin blue line sticker on the back of [the] car," which Alton assumed referred to the driver's probable affiliation with law enforcement, most likely the Metropolitan Police Department (MPD). *Id.* at 8, 70.

The driver promptly obeyed Alton's signal to pull over and, as Alton approached the car, the driver, Vinton, lowered all his windows. *Id.* at 10, 70. Alton asked if Vinton was in law enforcement and Vinton said he worked in "personal security." *Id.* at 11, 71. Alton immediately saw a knife with

a five-and-a-half inch sheath on Vinton's backseat, in "close proximity" to Vinton, easily within reaching-distance. *Id.* at 11–12, 25, 37, 70–71. Vinton explained the knife was used when fishing with his grandfather, but Alton saw no other fishing equipment in the car. *Id.* at 12, 14, 71. He retrieved the knife and placed it on the roof of the car, "out of arm's reach of the driver." *Id.* at 14, 71. Alton asked if there were "any other weapons in the vehicle," and Vinton responded "no, he . . . ke[pt] that part of his trade at home." *Id.* at 14, 71. Alton then measured the car's windows with a tint meter and determined they exceeded D.C.'s seventy-percent tint limit. *Id.* at 15–17, 71. He returned to his cruiser to prepare a citation. *Id.* at 17, 72.

Officer Alton was working alone and had not called for Park Police backup. However, when an MPD officer appeared, Alton "asked him to stop" because he had found a large knife and desired assistance in conducting a protective search of the car. *Id.* at 19–20, 72. The officer told Alton there had been a double-stabbing homicide in the same vicinity approximately twenty hours earlier. *Id.* at 20, 72. Alton told Vinton he was going to conduct a search for weapons and asked twice more whether there were any weapons in the car; Vinton first responded "no" but then responded, "not that I know of." *Id.* at 22, 73. Alton removed Vinton from the car and handcuffed him, but informed him he was not under arrest. *Id.* at 22, 73. A search of the passenger compartment of the car revealed two cans of mace in the front armrest, a "butterfly knife" under the front passenger-side floor mat, a bag of Styrofoam earplugs, and a locked briefcase on the backseat. *Id.* at 23–24, 26, 73–74. Vinton claimed he used the earplugs as sleeping aids and said the briefcase did not belong to him and he was unaware of its contents. *Id.* at 26, 74. Officer Alton phoned headquarters to request guidance on how to proceed, and U.S. Park Police

Investigator Hodge arrived shortly thereafter. *Id.* at 25–27, 74. Alton briefed him on the stop and Hodge conferred with a Park Police supervisor to assess whether Alton had probable cause to make an arrest. *Id.* at 27. They determined that he did. *Id.*

After placing Vinton under arrest for "possession of a prohibited weapon," Officer Alton pried open the locked briefcase. *Id.* at 27, 29, 74–75. Inside, he found three bags of ecstasy, three pistol magazines, a "fighting knife . . . like brass knuckles," and a .45 caliber semiautomatic pistol, cocked and loaded. *Id.* at 29, 75.

Vinton was charged in a two-count indictment with unlawful possession with intent to distribute ecstasy, 21 U.S.C. § 841; and using, carrying and possessing a firearm during a drug trafficking offense, 18 U.S.C. § 924(c)(1). He moved to suppress all of the tangible evidence recovered, and all of his statements made, during the traffic stop. Following a hearing, the district court denied the motion. Mem. Op., *United States v. Vinton*, No. 06-cr-298 (Feb. 12, 2007). Vinton was convicted by a jury of both counts and was sentenced to twenty-seven months' imprisonment on the first count and sixty months' on the second count, to run consecutively, as well as three years' supervised release. He brings this appeal arguing his motion to suppress was erroneously denied.

We review "determinations of reasonable suspicion and probable cause . . . *de novo*" but "review findings of historical fact only for clear error and . . . give due weight to inferences drawn from those facts by" the district court. *Ornelas v. United States*, 517 U.S. 690, 699 (1996).

II

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. "Time and again, [the Supreme] Court has observed that searches and seizures conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well delineated exceptions." *Minnesota v. Dickerson*, 508 U.S. 366, 372 (1993). The government relies on several exceptions in urging us to uphold the denial of Vinton's motion to suppress. We will address each issue in sequence: Did Officer Alton have the right to search the passenger compartment of Vinton's car? Following this search, was Vinton properly arrested? Was the search of the briefcase permissible?

A

The Supreme Court has long "recognized that traffic stops are especially fraught with danger to police officers" and that the "risk of harm to both the police and the occupants [of a stopped vehicle] is minimized if the officers routinely exercise unquestioned command of the situation." *Arizona v. Johnson*, 129 S. Ct. 781, 786 (2009) (internal quotation marks and citations omitted) (alteration in original). Thus, during a traffic stop, in order "to allow the officer to pursue his investigation without fear of violence," *Adams v. Williams*, 407 U.S. 143, 146 (1972), the officer may order the driver out of his car and may search the passenger compartment of the car for weapons if the officer develops a reasonable suspicion that the driver is "dangerous and . . . may gain immediate control of weapons" inside the car. *Michigan v. Long*, 463

U.S. 1032, 1049 (1983) (citing *Terry v. Ohio*, 392 U.S. 1, 21 (1968)) (footnote omitted); *see Pennsylvania v. Mimms*, 434 U.S. 106, 111 n.6 (1977) (per curiam). Courts assess "the totality of the circumstances . . . to see whether the detaining officer ha[d] a particularized and objective basis" for suspecting the driver was armed and dangerous, acknowledging that the "likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *United States v. Arvizu*, 534 U.S. 266, 273–74 (2002) (internal quotation marks omitted).

Here, the facts that accumulated within the first few moments of the traffic stop established a particularized and objective basis for suspecting Vinton might be armed and dangerous. As an initial matter, Vinton does not argue that Officer Alton had an insufficient basis for pulling him over. Indeed, it is clear that Vinton was properly stopped because Officer Alton's firsthand observations gave him probable cause to believe that Vinton had been speeding and driving with windows tinted in excess of the legal limit. *See* Suppression Tr. at 8, 69; *Whren v. United States*, 517 U.S. 806, 810 (1996).

Most crucially, upon approaching Vinton's car, Officer Alton saw a knife with a five-and-a-half-inch sheath in plain view on the backseat, easily within reaching-distance of Vinton. *See* Suppression Tr. at 11–12, 25, 37, 70. "[T]he presence of one weapon may justifiably arouse concern that there may be more in the vicinity." *United States v. Christian*, 187 F.3d 663, 669 (D.C. Cir. 1999). For instance, in *Long*, the Supreme Court held that after the officers observed "a large knife in the interior of the car," they were justified in "conduct[ing] an area search of the passenger compartment" of the car "to ensure that there were no other

weapons" in "those areas to which Long would generally have immediate control." 463 U.S. at 1050–51. Similarly, in *Christian*, we held that because the officer "saw [a] dagger in plain view" when he "arrived at Christian's car," he "had sufficient indication Christian might be armed and dangerous to justify a protective search for weapons." 187 F.3d at 669. Like the defendants in *Long* and *Christian*, Vinton possessed in plain view a knife capable of being used to cause serious bodily harm. Although Officer Alton removed this knife and placed it out of arm's reach on the roof of Vinton's car, he was justifiably concerned that additional weapons might be hidden elsewhere in the vicinity. This concern was not abated by ordering Vinton out of the car and handcuffing him, because had Vinton ultimately not been arrested, he would have been "permitted to reenter his automobile, and he w[ould] then have [had] access to any weapons inside." *Long*, 463 U.S. at 1052.

We reject Vinton's argument that while a dagger may justify a protective search for additional weapons, *see Christian*, 187 F.3d at 669, a sheathed knife like Vinton's may not. "[A] *Terry* investigation . . . involves a police investigation at close range, when the officer remains particularly vulnerable . . . [and] must make a quick decision as to how to protect himself and others from possible danger." *Long*, 463 U.S. at 1052 (internal quotation marks and citation omitted). Officer Alton did not have time to perform a close inspection of Vinton's sheathed knife to determine precisely how dangerous it was. Nor was Officer Alton required to accept Vinton's claim that he used the knife only for fishing with his grandfather. For one, Alton observed no other fishing equipment in the car that might have corroborated this story. *See* Suppression Tr. at 14, 71. But regardless, even a lawfully-possessed fishing knife can be used as a dangerous weapon. *See Long*, 463 U.S. at 1052 n.16 (holding that

possession of lawful hunting knife contributed to reasonable suspicion that driver was armed and dangerous). Moreover, there was an additional reason for viewing Vinton's explanations with skepticism. The "thin blue line sticker" on the back of his car, *see* Suppression Tr. at 8, 70—which, as Vinton concedes, "suggested a connection with law enforcement," Appellant's Br. 36—could have been viewed as a deliberate attempt to create the false impression that Vinton was affiliated with law enforcement. Furthermore, while Alton's newly-acquired knowledge of a recent double-stabbing homicide in the same neighborhood, *see* Suppression Tr. at 20, 72, was not itself sufficient to justify the protective search, it added to the circumstances warranting Alton's decision to search the car to ensure his own safety.

Finally, Vinton's argument that Officer Alton did not subjectively believe Vinton was dangerous may easily be rejected. Because "[t]he Fourth Amendment test is objective," an officer's "actual subjective motives . . . are irrelevant to the Fourth Amendment analysis of [a] traffic stop and protective search of the car." *United States v. Washington*, 559 F.3d 573, 575 (D.C. Cir. 2009). Of course, it was possible that Vinton used his sheathed knife only for fishing, that he had benign reasons for having excessively tinted windows, and that his "thin blue line" sticker was not meant to be misleading. But "[a] determination that reasonable suspicion exists . . . need not rule out the possibility of innocent conduct." *Arvizu*, 534 U.S. at 277. Examining the totality of the circumstances objectively, Officer Alton had a reasonable belief, based on specific and articulable facts, that Vinton was armed and dangerous. *See Long*, 463 U.S. at 1049. Thus, he properly searched the passenger compartment of Vinton's car for additional weapons.

9

B

"[A] warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004). "There is no precise formula for the probability required for probable cause. Somewhere between 'less than evidence which would justify . . . conviction' and 'more than bare suspicion,' probable cause is satisfied. . . . The precise point is indeterminate. . . . The standard is to be met by applying a totality-of-the-circumstances analysis." *United States v. Riley*, 351 F.3d 1265, 1267 (D.C. Cir. 2003) (internal quotation marks omitted).

In the course of searching Vinton's car for weapons, Officer Alton found, among other things, a "butterfly knife" hidden under the passenger-side floor mat. *See* Suppression Tr. at 23, 73. Vinton was eventually arrested for "possession of a prohibited weapon" (PPW), D.C. Code § 22-4514(b). However, because the offense of PPW requires "proof of intent to use [the weapon] *unlawfully* against another," *United States v. Broadie*, 452 F.3d 875, 881 (D.C. Cir. 2006) (emphasis added) (internal quotation marks omitted), the government has conceded that Officer Alton lacked probable cause to arrest for PPW. The government nonetheless argues the arrest was valid because there was probable cause to believe Vinton committed the offense of "carrying a dangerous weapon" (CDW), D.C. Code § 22-4504(a), which "does not require proof of intent to use the weapon for an unlawful purpose," *Broadie*, 452 F.3d at 881. Because the Fourth Amendment inquiry is objective, an officer's "subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause." *Devenpeck*, 543 U.S. at 153; *see also*

*Broadie*, 452 F.3d at 881 (holding arrest was valid because there was probable cause of CDW, even though officer incorrectly believed at the time that he had probable cause of PPW).

The CDW statute prohibits "carry[ing] within the District of Columbia either openly or concealed on or about their person . . . any deadly or dangerous weapon." D.C. Code § 22-4504(a). As we have explained, under District of Columbia case law, a "deadly or dangerous weapon" is "anything that is '*likely* to produce death or great bodily injury by the use made of it.'" *Broadie*, 452 F.3d at 881 (quoting *Strong v. United States*, 581 A.2d 383, 386 (D.C. 1990)). Two categories of objects are likely to produce such harm: (1) those that are "inherently dangerous," *i.e.*, where "the design of the object is such that in its ordinary use it is likely to cause great bodily injury"; and (2) those that ostensibly may be "used as a tool in certain trades or hobbies or . . . may be carried for utilitarian reasons," but where "the surrounding circumstances indicate" that "the purpose of carrying the object . . . is its use as a weapon." *Id.* at 882 (quoting *Strong*, 581 A.2d at 386; *Scott v. United States*, 243 A.2d 54, 56 (D.C. 1968)).

"A butterfly knife has a split metal handle which encases a single-edged blade. The knife is opened by folding back both halves to expose the blade." *United States v. Kashiwabara*, 993 F.2d 885 (table), 1993 WL 148094, at *1 (9th Cir. 1993); *see also* Suppression Tr. at 23–24 (describing the butterfly knife as a knife, commonly "used in martial arts," where the blade "folds out" from the handle).[1] The

---

[1] The district court at one point suggested the butterfly knife had "several different blades." Suppression Tr. at 73. After being corrected, the court appeared to withdraw that finding. *Id.* at 77–78. Because the testimony established that the butterfly knife had

record does not establish that butterfly knives are "inherently dangerous," and indeed, one can imagine they might be used for sport or entertainment. Nonetheless, the surrounding circumstances provided Officer Alton with probable cause to believe Vinton intended to use this knife as a dangerous weapon. *See Lewis v. United States*, 767 A.2d 219, 222 (D.C. 2001) (explaining that where the knife possessed by the defendant is not inherently dangerous, "the government must prove beyond a reasonable doubt that . . . the purpose of carrying the instrument was its use as a dangerous weapon").

The design of a butterfly knife makes it principally useful as an easily concealable and quickly deployable weapon capable of injuring another person in an altercation at close range. *See, e.g.*, *Taylor v. United States*, 848 F.2d 715, 716, 720 (6th Cir. 1988) (butterfly knives are "most often associated with the martial arts and with combat . . . [and are] potentially dangerous, lethal" weapons that "can be opened very rapidly, perhaps in less than 5 seconds" (internal quotation marks omitted)); *United States v. Stroman*, No. Crim. 05-66-P-S, 2006 WL 83404, at *14 (D. Me. Jan. 9, 2006) (To deploy a butterfly knife, "[t]he wielder releases one of the halves of the handle and through a combination of gravity and centrifugal force, the latter generated by a movement of the arm or wrist, the wielder swings that half of the handle around until it meets the other half. These forces also swing the *blade* into position." (internal quotation marks omitted)). Vinton never offered Officer Alton any explanation whatsoever for his possession of this knife, and certainly, he never suggested he was specially trained in the use of butterfly knives for sport or entertainment purposes. Thus, Officer Alton was entitled to rely on his common-sense

---

only one blade, and because both parties agree on this point, our analysis assumes the knife had only one blade. *See id.* at 23, 76–77.

assessment that Vinton probably intended to use the knife for its most obvious purpose, fighting. *Cf. Broadie*, 452 F.3d at 882–83 (explaining that although an ASP baton is not inherently dangerous, "the normal and the only apparent use of an ASP baton . . . is to strike another" and that "a reasonable officer surely would believe that a civilian, presumably without police training, would likely inflict great bodily injury when using [one]"). If anything, Vinton's stated profession—personal security—along with his allusion to possessing weapons at home increased the likelihood that he carried the butterfly knife for use as a weapon. *See* Suppression Tr. at 11, 14, 71. That he may have planned to use the knife only in self-defense or defense of another is irrelevant, so long as he intended to use it as a weapon. *See Broadie*, 452 F.3d at 881 ("[N]either self-defense nor any other 'lawful purpose' is material to the offense or sufficient to avoid liability [for CDW]." (citing *Monroe v. United States*, 598 A.2d 439, 440 (D.C. 1991))).[2]

In addition, the knife was hidden under the floor mat. *See* Suppression Tr. at 23, 73. Vinton's various explanations—that maybe the knife fell inadvertently and landed under the mat, or perhaps it was stashed under the mat to prevent passersby from being enticed to break into the car to steal it—are, of course, possible. But Officer Alton was not unreasonable in believing that the likeliest explanation for the knife's concealment was that Vinton intended to use it as a weapon and therefore wanted to hide it from police officers and potential adversaries. Furthermore, Vinton lied about the knife's existence. Officer Alton asked Vinton three times whether there were any weapons in the car other than the sheathed knife, and each time Vinton responded in the

---

[2] Vinton has not argued that the CDW statute is unconstitutional. Therefore, we have no occasion to address the issue and our holding expresses no view on it.

negative. *See id.* at 14, 22, 71, 73. This lack of candor reasonably suggested to Officer Alton that Vinton intended to use the butterfly knife for malicious purposes. Thus, the totality of the circumstances provided probable cause to believe Vinton was carrying a "deadly or dangerous weapon" in violation of D.C. Code § 22-4504(a).

Finally, Vinton argues that any finding of probable cause must be struck down because the facts supporting probable cause were uncovered only after unlawfully extending the *Terry* stop beyond a reasonable duration. "[A] search which is reasonable at its inception may violate the Fourth Amendment by virtue of its intolerable intensity and scope." *Terry*, 392 U.S. at 18. To "assess[] whether a detention is too long in duration to be justified as an investigative stop, we . . . examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly." *United States v. Sharpe*, 470 U.S. 675, 686 (1985). Vinton contends that "[a]fter the frisk was complete, the officers continued to detain Vinton for approximately 45 minutes, including 30 minutes until Investigator Hodge arrived on the scene and an additional 15 minutes while the[y] obtained advice from supervisors . . . ." Appellant's Br. 38–39. However, Vinton waived this argument by failing to raise it before the district court. *See* Fed. R. Crim. P. 12(e) (any defense or objection not raised in a motion to suppress is waived); *United States v. Redman*, 331 F.3d 982, 986 (D.C. Cir. 2003) (holding appellant waived argument by failing to assert it at suppression hearing). In any event, within the first few minutes of the traffic stop—as soon as he found the butterfly knife—Officer Alton had probable cause to arrest Vinton. Thus, Alton acted promptly and diligently to confirm his initial suspicions. His subsequent efforts to determine precisely how to proceed

were a conscientious vindication of Vinton's rights, not a violation of them.

C

Until recently, it was widely understood that *New York v. Belton*, 453 U.S. 454, 460 (1981), established a "bright-line rule," whereby "incident to arrest the police may search the passenger compartment of an arrestee's automobile." *United States v. Wesley*, 293 F.3d 541, 548 (D.C. Cir. 2002); *see also United States v. Mapp*, 476 F.3d 1012, 1018 (D.C. Cir. 2007) ("As long as the arrest of an occupant of a car is lawful, a search of the passenger compartment is reasonable."). But while the instant appeal was pending, the Supreme Court decided *Arizona v. Gant*, which reshaped the law governing searches incident to arrest in the automobile context. 129 S. Ct. at 1714. Noting that *Chimel v. California*, 395 U.S. 752, 763 (1969), had held that "a search incident to arrest may only include the arrestee's person and the area within his immediate control," the Court explained that a reading of *Belton* that would *always* authorize a vehicle search incident to an occupant's arrest "would . . . untether the rule from the justifications underlying the *Chimel* exception." *Id.* at 1716, 1719 (internal quotation marks omitted). Thus, *Gant* held police may search a vehicle incident to the arrest of an occupant only in two circumstances: (1) "when the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search" (the safety rationale); or (2) "when it is 'reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle'" (the evidentiary rationale). *Id.* at 1719 (footnote omitted) (quoting *Thornton v. United States*, 541 U.S. 615, 632 (2004) (Scalia, J., concurring in judgment)).[3]

---

[3] Vinton argues that *Gant* also applies to *Terry* searches. Thus, he contends Officer Alton's initial protective search of his car was

During the protective search of Vinton's car, Officer Alton found a locked briefcase on the backseat. *See* Suppression Tr. at 24, 26, 74. After placing Vinton under arrest, Alton pried it open. *See id.* at 29, 74–75. The government concedes that this search incident to Vinton's arrest cannot be upheld under *Gant*'s safety rationale because Vinton was handcuffed at the time. *See* Appellee's Br. 39. Nonetheless, the government argues the search should be upheld under *Gant*'s evidentiary rationale.[4]

The Supreme Court did not elaborate on the circumstances when it will be "reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle." *Gant*, 129 S. Ct. at 1719 (internal quotation marks omitted); *see also id.* (noting that this evidentiary rationale "does not follow from *Chimel*" but is based on "circumstances unique to the vehicle context"). Presumably, the "reasonable to believe" standard requires less than probable cause, because otherwise *Gant*'s evidentiary rationale would merely

---

unconstitutional because he was handcuffed at the time of the search. We decline to read *Gant* so expansively. The Supreme Court explicitly limited its holding to the search-incident-to-arrest context, *see Gant*, 129 S. Ct. at 1723–24, and it is doubtful that the same rule ought to apply in the *Terry* search context, *see id.* at 1724 (Scalia, J., concurring) ("It must be borne in mind that we are speaking here only of a rule automatically permitting a search when the driver or an occupant is arrested. . . . In the no-arrest case, the possibility of access to weapons in the vehicle always exists, since the driver or passenger will be allowed to return to the vehicle when the interrogation is completed.").

[4] The government also argues Vinton had no reasonable expectation of privacy in the briefcase, and consequently no protected Fourth Amendment interest in it, because he disclaimed ownership of it. We have no need to reach this issue.

duplicate the "automobile exception," which the Court specifically identified as a distinct exception to the warrant requirement. *See id.* at 1721 (citing *United States v. Ross*, 456 U.S. 798, 820–21 (1982)). Rather, the "reasonable to believe" standard probably is akin to the "reasonable suspicion" standard required to justify a *Terry* search. *See, e.g.*, *Adams*, 407 U.S. at 146 (noting that a *Terry* search is permissible if the officer "has *reason to believe* that the suspect is armed and dangerous" (emphasis added)). Accordingly, the officer's assessment of the likelihood that there will be relevant evidence inside the car must be based on more than "a mere hunch," but "falls considerably short of [needing to] satisfy[] a preponderance of the evidence standard." *Arvizu*, 534 U.S. at 274.

The Supreme Court explained that "[i]n many cases, as when a recent occupant is arrested for a traffic violation, there will be no reasonable basis to believe the vehicle contains relevant evidence. But in others, including *Belton* and *Thornton*, the offense of arrest will supply a basis for searching the passenger compartment of an arrestee's vehicle and any containers therein." *Gant*, 129 S. Ct. at 1719 (citation omitted). In both *Belton* and *Thornton*, the vehicle occupants were arrested for possession of narcotics. *See Belton*, 453 U.S. at 456; *Thornton*, 541 U.S. at 618. Had Vinton been arrested merely for speeding or driving with excessively tinted windows, *Gant*'s evidentiary rationale obviously would not have authorized a subsequent search because under the circumstances it would have been very unlikely that evidence relevant to either of those traffic offenses would be found inside his car. *See Gant*, 129 S. Ct. at 1719 (holding that "[a]n evidentiary basis for the search was . . . lacking . . . [because] Gant was arrested for driving with a suspended license—an offense for which police could not expect to find evidence in the passenger compartment of

[his] car"). But instead, Vinton was arrested for the unlawful possession of a weapon, an offense that resembles narcotics-possession offenses far more closely than it resembles a traffic violation. Indeed, it is difficult to imagine a principled basis for distinguishing the possession of narcotics from the possession of an unlawful weapon, where an arrest for the former makes it reasonable to believe additional narcotics remain in the car, but an arrest for the latter does not make it reasonable to believe additional weapons are in the car. In both cases, the defendant has been caught with a type of contraband sufficiently small to be hidden throughout a car and frequently possessed in multiple quantities. Indeed, this fact was well-known to Officer Alton, who testified that "generally if one weapon is there . . . there's the chance that other weapons could be there." Suppression Tr. 14; *see id.* at 28.

The facts of this case establish that Alton was reasonable in expecting there might be additional weapons in the car, particularly in the locked briefcase found on the backseat. Most significantly, Officer Alton already had found *two* knives, one of which was hidden. He also had found two cans of mace and a bag of earplugs. *See id.* at 23, 26, 73–74. Of course, earplugs often are used for purposes unrelated to weapons, but, as Alton reasonably recognized, they also are commonly used at firing ranges to muffle the noise from guns. *See id.* at 26, 74. Thus, having found two objects, mace and earplugs, that suggested at least a possible association with weapons, along with two other objects, a sheathed knife and a butterfly knife, that were clearly capable of being used as weapons, Officer Alton had an objectively reasonable basis for believing that additional weapons might be inside the car. A material element of the CDW offense is that the defendant intends to use the object as a dangerous weapon. *See Lewis*, 767 A.2d at 222. Finding additional

weapons in Vinton's possession would have provided strong circumstantial evidence of this specific intent. Thus, because it was "reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle," Officer Alton had the right to search the passenger compartment of Vinton's car "and any containers therein," including the locked briefcase.[5] *Gant*, 129 S. Ct. at 1719 (internal quotation marks omitted). The district court therefore properly admitted into evidence the ecstasy, semiautomatic pistol, pistol magazines, and "fighting knife" discovered inside the briefcase.

## III

Vinton also argues his statements were admitted into evidence in violation of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966). *Miranda* warnings are required "where a suspect in custody is subjected to interrogation." *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980). Because "ordinary traffic stops" are "noncoercive," "persons temporarily detained pursuant to such stops are not 'in custody' for the purposes of Miranda." *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984). However, "[i]f a motorist who has been detained pursuant to a traffic stop thereafter is subjected to treatment that renders him 'in custody' for practical purposes, he will be entitled to the full panoply of protections prescribed by Miranda." *Id.*

---

[5] We note that *Gant* sometimes states that it must be reasonable to believe there will be evidence "of" the offense of arrest inside the car, and elsewhere speaks more broadly of evidence "relevant" to the offense of arrest. *Compare* 129 S. Ct. at 1714, 1720–23, *with id.* at 1719 (quoting *Thornton*, 541 U.S. at 632 (Scalia, J., concurring in judgment)). But relevant evidence is evidence of the offense, *see* FED. R. EVID. 401, so the difference in phrasing is immaterial.

19

Most of the statements Vinton claims were improperly admitted were made by him while he was sitting in his car, before Officer Alton handcuffed him and searched his car. This includes his statements that he worked in personal security, used the sheathed knife only for fishing with his grandfather, had no other weapons in the car, and "keeps that part of his trade at home." *See* Suppression Tr. at 11–12, 14, 71. At the time he made these statements, Vinton was not "in custody" and faced an "ordinary," "noncoercive" traffic stop. *See Berkemer*, 468 U.S. at 440. Thus, he had no entitlement to *Miranda* warnings.

Vinton also challenges the admission of two statements he made after being handcuffed for some time but before being formally arrested: that he used the earplugs as sleeping aids, and that he did not own the locked briefcase or know what was inside of it. *See* Suppression Tr. at 26, 74. We need not decide whether Vinton was "in custody" at the time he made these statements, because any *Miranda* violation was harmless beyond a reasonable doubt. Both of these statements were wholly exculpatory and could not have "contribute[d] to the verdict obtained." *United States v. Harris*, 515 F.3d 1307, 1311 (D.C. Cir. 2008) (internal quotation marks omitted). Thus, even assuming a *Miranda* violation occurred, there is no basis for reversal.

IV

For the foregoing reasons, the judgment of the district court is

*Affirmed*.