# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued September 25, 2007          Decided October 23, 2007

No. 05-3171

UNITED STATES OF AMERICA,
APPELLEE

v.

RONNELL D. HOLMES,
APPELLANT

Appeal from the United States District Court
for the District of Columbia
(No. 05cr00094-01)

*Beverly G. Dyer*, Assistant Federal Public Defender, argued the cause for appellant. With her on the briefs was *A. J. Kramer*, Federal Public Defender. *Neil H. Jaffee*, Assistant Federal Public Defender, entered an appearance.

*Stratton C. Strand*, Assistant U.S. Attorney, argued the cause for appellee. On the brief were *Jeffrey A. Taylor*, U.S. Attorney, and *Roy W. McLeese, III*, *Elizabeth Trosman*, and *Elizabeth Gabriel*, Assistant U.S. Attorneys.

Before: GINSBURG, *Chief Judge*, and SENTELLE and TATEL, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* SENTELLE.

SENTELLE, *Circuit Judge*: Appellant Ronnell Holmes was found guilty at a jury trial in the U.S. District Court for the District of Columbia for possession of a firearm and ammunition by a convicted felon in violation of 18 U.S.C. § 922(g)(1). Holmes appeals his conviction contending that the district court erroneously denied his motion to suppress evidence of the firearm and ammunition. He argues that police officers discovered the evidence as a result of an illegal seizure of his car keys during a *Terry* stop. We agree. For the reasons set forth below, we reverse the judgment of conviction.

## I. BACKGROUND

At approximately 3:40 a.m. on February 13, 2005, Metropolitan Police Department officers John Delaroderie and Steven Greene observed Holmes standing "very close" to a woman in an alley in an area known for drug dealing and prostitution. Upon seeing the police vehicle and Officer Delaroderie observing them from inside the cruiser, Holmes and the unidentified woman immediately ran away in different directions. Given the couple's suspicious behavior, combined with the early hour and the location, Delaroderie exited his vehicle and chased Holmes, who hurdled several residential fences in his attempt to elude the pursuing officer.

When Delaroderie finally caught Holmes, he told him to turn around and put his hands on a fence. At that point, Officer Greene arrived in the police cruiser and proceeded to pat Holmes down "to make sure there w[ere] no knives or guns on him for [the officers'] own safety." During the patdown, Greene noticed a package of cigarette rolling papers protruding from Holmes's front pants pocket, and felt a set of keys and a wallet in Holmes's pockets. Officer Greene removed the keys and

wallet and decided to handcuff Holmes due to the flight risk he posed.

The officers began questioning Holmes about why he had fled when he saw the police cruiser, and Holmes responded that it was because he had been soliciting oral sex in the alley. Officer Delaroderie then began filling out a police contact form, which required Holmes's general information, including his name and address. Since the officers had already removed Holmes's wallet, Delaroderie used Holmes's Maryland driver's license to fill out the form. After learning Holmes's identity, the officers called in Holmes's information for a warrant check. The check returned negative for outstanding warrants but revealed that Holmes was on parole. On further questioning about his parole status, Holmes revealed to the officers that he had an earlier conviction for a drug offense.

When questioned about how he happened to be in the District that night given his Maryland residence, Holmes first told the officers that he had taken a Metro train into town. Disbelieving his answer due to the time of night, the officers again posed the same question, at which point Holmes stated that a friend had dropped him off. Officer Greene then asked Holmes why he had car keys with him, at which point Holmes admitted he had driven himself into the District that night. The officers asked him where his car was parked, and after first telling them it was parked a few blocks away, he admitted that it was parked just around the corner.

With Holmes's car keys in hand, Officer Greene walked to the street and used the remote opener on the keychain to identify Holmes's Acura, which lit up when Greene pressed the unlock button within transmitter range. Officer Greene returned to where Holmes and Officer Delaroderie were standing and reported that he had found the car. The officers then asked

Holmes, still handcuffed, if he would sign a consent-to-search form to allow them to search his car. Officer Greene told Holmes they wanted to search his car because they were concerned that he had drugs inside. The officers also commented to Holmes that they felt they already had authority to arrest him for possessing the cigarette rolling papers.

The officers explained to Holmes that his decision to consent to the search was entirely voluntary and that he could refuse; Officer Greene actually read the consent form to Holmes, who agreed to sign it. The officers had to release one of Holmes's hands from the cuffs so he could sign the consent form. Holmes was present at the vehicle when Officer Greene searched it, and specifically requested that Greene not touch the driver's seat's electrical controls, explaining that they were set for his wife. When Greene bent down to look under that seat, he discovered a 9mm Ruger P89 pistol. The officers then placed Holmes under arrest for carrying a pistol without a license and for possession of drug paraphernalia. Holmes was ultimately indicted only for unlawful possession of a firearm and ammunition by a felon.

Prior to trial, Holmes moved to suppress evidence of the pistol seized from his car. While Holmes conceded that the *Terry* stop and frisk were proper under the circumstances, he challenged, among other things, Officer Greene's removal of his keys and wallet during the *Terry* patdown and argued that his eventual consent to the search of his vehicle was involuntary.

When the district court considered Holmes's argument that the police had seized his car keys illegally and that this seizure had led directly to the discovery of incriminating evidence in his vehicle, the court reasoned that whether Officer Greene had felt the keys while they remained in Holmes's pocket or taken them out was immaterial to Greene's line of questioning about how

Holmes had come to the area. The court reasoned that the officers' feeling Holmes's keys in his pocket during the patdown —not the seizure of Holmes's keys—had led to discovery of the vehicle, so the officers' seizure of Holmes's keys did not lead to the discovery of the pistol inside.

Holmes also argued that his consent to search the vehicle was not obtained freely since he was still in handcuffs and was obviously not free to leave when the officers obtained his written consent to search. Based on the signed consent form and the police officers' credible testimony that they did not use force, coercion or threats during Holmes's apprehension and detention, the district court reasoned that Holmes's consent to search was voluntary.

The district court denied each of Holmes's grounds for suppression and ruled the weapon admissible into evidence. A jury found Holmes guilty of one count of possession of a firearm and ammunition by a convicted felon in violation of 18 U.S.C. § 922(g)(1). On September 23, 2005, the district court sentenced Holmes to 102 months in prison, followed by three years of supervised release. Holmes now appeals the district court's denial of his suppression motion.

## II. ANALYSIS

We consider a district court's legal rulings on a suppression motion *de novo* and review its factual findings for clear error giving "due weight to inferences drawn from those facts" and its determination of witness credibility. *Ornelas v. United States*, 517 U.S. 690, 699 (1996); *United States v. Brown*, 334 F.3d 1161, 1164 (D.C. Cir. 2003).

To prevail on a motion to suppress evidence as the fruit of a Fourth Amendment violation, a defendant must first establish that the search or seizure was illegal. *See Alderman v. United States*, 394 U.S. 165, 183 (1969); *United States v. Nava-Ramirez*, 210 F.3d 1128, 1131 (10th Cir. 2000). That is not at issue in this case. The government now concedes, as Holmes had argued at the suppression hearing, that the police officers exceeded the permissible scope of a protective frisk authorized by *Terry v. Ohio*, 392 U.S. 1 (1968), by seizing appellant's keys from inside his pocket. We agree that police seizure of items that are neither weapons nor apparent contraband during a *Terry* patdown exceeds that doctrine's limited exception to the Fourth Amendment's prohibition on warrantless searches and seizures. In *Minnesota v. Dickerson*, 508 U.S. 366 (1993), the Supreme Court explained that for a *Terry* patdown to survive constitutional scrutiny, it must be "strictly 'limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby.'" *Id.* at 373 (quoting *Terry*, 392 U.S. at 26). It is true that an officer conducting a legitimate *Terry* stop who "discover[s] contraband other than weapons . . . cannot be required to ignore the contraband, and the Fourth Amendment does not require its suppression." *Michigan v. Long*, 463 U.S. 1032, 1050 (1983). But there is no claim here that the keys constituted contraband, and the officer had no right to take them from Holmes's pocket during the patdown.

Next, the defendant must make a prima facie showing of a causal nexus between the Fourth Amendment violation and the evidence he seeks to suppress. *See United States v. Crews*, 445 U.S. 463, 471 (1980). In this case, Holmes has met his burden of showing that, but for the illegal seizure of the keys, the officers likely would not have discovered the gun and ammunition in his car. If they had not removed Holmes's keys during the patdown, the officers would not have been able to visibly inspect them to determine whether Holmes possessed a

car key.  Visual confirmation that Holmes was carrying car keys gave the officers reason to continue their line of questioning about how Holmes came to the area that night.  Additionally, Officer Greene testified that he used the remote opener on the keychain to both locate and unlock Holmes's vehicle on the adjacent street.  Each of these factors contributed to the pistol's discovery, and we are satisfied Holmes met his burden of showing a prima facie causal nexus between the illegal seizure and the challenged evidence.

After the defendant has met his burden, the evidence must be suppressed unless the government proves, by a preponderance of evidence, that the evidence would have been discovered inevitably, was discovered through independent means, or that its discovery was so attenuated from the illegal search or seizure that the taint of the unlawful government conduct was dissipated.  *See Alderman*, 394 U.S. at 183; *United States v. Kornegay*, 410 F.3d 89, 93-94 (1st Cir. 2005).

Because the district court did not hold that the key seizure violated Holmes's Fourth Amendment rights, it failed to shift the burden at this point.  The district court should have placed on the government the burden of proving that the gun would have been discovered inevitably even without the illegal seizure or, alternatively, that Holmes's consent to search his vehicle attenuated the taint, the two arguments it now advances.  Though the government argues that the district court made findings favorable to the government on both issues which should now be accepted by this Court, to the extent that this is true, the district court arrived at those conclusions after incorrectly assigning the burden of proof.  Thus, while we review the district court's factual findings under a clearly erroneous standard, where conclusions are based on the application of the incorrect legal standard to those facts, we review those conclusions *de novo*.  Using that standard, we now

consider the government's two arguments that the challenged evidence should have been admitted notwithstanding the illegal seizure.

1. *Inevitable Discovery*

The government argues that, even without the illegal seizure of Holmes's car keys during the *Terry* patdown, Officers Greene and Delaroderie would have eventually discovered Holmes's car. It argues that, based on their lawfully gained knowledge that Holmes possessed keys in his pocket, which Officer Greene obtained from patting down Holmes's clothing, and Holmes's evasive responses to their questions, they would have continued questioning him until they had persuaded him to lead them to his car. This argument is too speculative to carry the government's burden.

To prevail on an inevitable discovery theory, the government must prove by a preponderance of the evidence that, even without the unlawful seizure, the evidence it seeks to admit would have been discovered anyway. *Nix v. Williams*, 467 U.S. 431, 444 n.5 (1984). Further, "inevitable discovery involves no speculative elements but focuses on demonstrated historical facts capable of ready verification or impeachment and does not require a departure from the usual burden of proof at suppression hearings." *Id.*

The government points to no evidence in the record with which it can attempt to meet its burden to prove that Holmes's car, and ultimately the pistol therein, would inevitably have been discovered absent the unlawful seizure of Holmes's keys. While the government argues that "nothing suggests that, had Officer Greene not seized the keys, he would not have asked appellant about them," this argument only serves to expose the weakness of its evidentiary position. The only part of the record the

government points to in support of its inevitable discovery argument is a colloquy between the district court and defense counsel at the suppression hearing. During that discussion, in which the district court was testing the defense's arguments, the court speculated that the officer could have interrogated Holmes about the car keys "even if they were still in the pocket." While it is certainly true that when the officer felt something that could have been keys, he might have asked Holmes if they were in fact keys. And it is possible that Holmes might have answered truthfully. It is further possible that the officer might then have asked him if one of them was a car key. It is further possible that Holmes again might have been truthful. It is then possible that the colloquy envisioned by the government would have occurred. However, all of this is nothing more than possibility. As evidence of inevitable discovery (and whether it was actually a finding of the court is dubious), this fails under *Nix*. It is, at best, speculative rather than based on "demonstrated historical facts capable of ready verification." *Id.* We therefore reject this theory and move on to the government's alternative argument.

2. *Attenuation of Taint*

The government argues that, even if the government would not have inevitably discovered Holmes's car without the illegal seizure of his car keys, his consent to the officers' search of his car purged the taint of the prior illegal seizure. We disagree.

Evidence obtained following an unlawful seizure may be admissible if the government can demonstrate that there was an act prior to discovery of the challenged evidence sufficient "to purge the primary taint" and break the causal chain between the illegal government conduct and the evidence's ultimate discovery. *See Brown v. Illinois*, 422 U.S. 590, 602 (1975); *United States v. Wood*, 981 F.2d 536, 541 (D.C. Cir. 1992) ("Once an illegal seizure is established, the Government has the

burden of proving that the causal chain was sufficiently attenuated by an independent act to dissipate the taint of the illegality.").

Although *Brown* involved a confession following an illegal arrest, its analysis applies equally to consent given after an illegal search or seizure. *See United States v. Snype*, 441 F.3d 119, 134 (2d Cir. 2006); *United States v. Jordan*, 951 F.2d 1278, 1283 n.3 (D.C. Cir. 1991). Consent to a search will purge the taint of an unlawful seizure only if that consent is not merely voluntary but "sufficiently an act of free will" that it was not a result of the exploitation of the unlawful seizure. *Brown*, 422 U.S. at 599-604. Although the question whether a voluntary consent is a sufficiently free act to purge the taint "must be answered on the facts of each case [and] [n]o single fact is dispositive," *Brown* outlined four non-exclusive factors to consider: (1) whether *Miranda* warnings were given; (2) the temporal proximity of the arrest and the consent; (3) the presence of intervening circumstances; and (4) the purpose and flagrancy of the official misconduct. *Id.* at 603-04.

While the government argues that the *Brown* factors weigh in its favor and that it has met its burden of proving that Holmes's consent was an act of free will sufficient to purge the earlier taint, we disagree. Though we accept the district court's factual finding that the officers properly informed Holmes of his right to refuse consent and that he signed the form, we cannot conclude that this consent purged the taint, as there are simply too many factors weighing against such a conclusion. Since the facts necessary for each analysis are the same, we consider the question of voluntariness as we consider the *Brown* factors.

First, the officers did not give Holmes the *Miranda* warnings prior to eliciting his consent. The government contends that the officers were not required to do so because

Holmes was not then in "custody." We need not decide whether Holmes was entitled to *Miranda* warnings because the other circumstances show that his consent was not sufficiently free to purge the taint.

On the issue of temporal proximity, here there was virtually no temporal gap between the seizure and the consent. The entire encounter between Holmes and the police lasted just a few minutes between the illegal seizure and when the officers secured his signature on the consent form. This issue weighs heavily against a finding that Holmes's consent was an act of free will sufficient to purge the taint of the earlier illegal police conduct. *See United States v. Washington*, 387 F.3d 1060, 1073 (9th Cir. 2004) (holding 15 minutes insufficient); *United States v. Maez*, 872 F.2d 1444, 1456 (10th Cir. 1989) (holding 45 minutes insufficient).

Further, any "intervening circumstances" are of little help to the government, either. The entire incident occurred in the middle of the night on an empty street. Holmes's first interaction with the officers was a seemingly unprovoked flight from their presence, which, after they had caught and detained him, led them to place him in handcuffs for the remainder of the incident. After a patdown turned up only cigarette rolling papers, the officers informed him that this gave them authority to arrest him for possession of drug paraphernalia. The officers may also have implied that they had probable cause to get a warrant to search the vehicle for drugs based on Holmes's possession of the rolling papers. *See Washington*, 387 F.3d at 1076 ("[R]epeated reminders to [defendant] that the officers could arrest him at any time, in our view, appear to have been given as a tactic to coerce [him] into consenting to the search of his room."). By the time the officers sought Holmes's consent to search his car, the officers had already located his car and opened it with his car's remote door lock control as a direct

result of the illegal seizure. At the very least, it appears that Holmes faced a coercive situation at the time he gave consent since the implication was that his only prayer of avoiding arrest that night was to consent to the search and simply hope that the officers would not discover the hidden handgun. The intervening circumstances, therefore, strongly weigh against a finding that Holmes's consent was sufficient to purge the taint of the unlawful seizure.

Finally, while the government puts much weight on the lack of flagrant police misconduct, such as, for example, a threat of violence, and we accept the district court's credit of the officers' testimony to this effect, we cannot find that the absence of this factor compensated for the strongly coercive circumstances otherwise surrounding Holmes's grant of consent to search. We conclude that the government has not met its burden of proof to show that Holmes's consent constituted an intervening act of free will that broke the causal link between the unlawful seizure of Holmes's keys and discovery of the gun in his car. Accordingly, the government's attentuation of taint theory fails.

Since the government failed to meet its burden of proof to show that the officers' discovery of Holmes's firearm and ammunition was either inevitable in the absence of the unlawful key seizure or that the illegality of the seizure was cured by his subsequent consent to the search of his vehicle, we find that the district court erred in denying Holmes's motion to suppress evidence found in his vehicle.

## III. CONCLUSION

As this incorrectly admitted evidence formed the only factual basis supporting Holmes's conviction under 18 U.S.C. § 922(g)(1), we conclude that his conviction must be reversed.