# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued September 11, 2013      Decided March 21, 2014

No. 10-3099

UNITED STATES OF AMERICA,
APPELLEE

v.

DAVON PEYTON,
APPELLANT

Appeal from the United States District Court
for the District of Columbia
(No. 1:10-cr-00015-1)

*Lisa B. Wright*, Assistant Federal Public Defender, argued the cause for appellant. With her on the briefs was *A. J. Kramer*, Federal Public Defender.

*Anne Y. Park*, Assistant U.S. Attorney, argued the cause for appellee. With her on the brief were *Ronald C. Machen Jr.*, U.S. Attorney, and *Elizabeth Trosman*, *John P. Mannarino*, *Matthew M. Graves*, and *Steven B. Wasserman*, Assistant U.S. Attorneys.

Before: HENDERSON, GRIFFITH, and SRINIVASAN, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GRIFFITH.

Dissenting opinion filed by *Circuit Judge* HENDERSON.

GRIFFITH, *Circuit Judge*: Appellant Davon Peyton challenges the district court's ruling that evidence the police gathered from his apartment during two warrantless searches could be used against him at trial. For the reasons set forth below, we reverse in part, vacate in part, and remand the case to the district court.

I

Peyton and his 85-year-old great-great-grandmother, Martha Mae Hicks, shared a small, one-bedroom apartment in a complex at 401 K St. NW, Washington, D.C. Both were named as residents on the lease. Hicks used the bedroom, and Peyton kept his bed and belongings in the living room. On June 21, 2009, police officers arrested Peyton in the parking lot outside the apartment complex for possession of crack cocaine. Five days later, the police obtained and executed a search warrant for the apartment. The search yielded no evidence against Peyton, but resulted in the arrest of several people who were in the apartment at the time with drugs and drug paraphernalia.

Shortly thereafter, the police received a tip that Peyton was using the apartment to deal drugs. Four officers, including one who had participated in the earlier warrant search, returned to the apartment on July 14, this time without a warrant. The officers knew Peyton had recently been arrested yet again (the record is not clear why) and would not be there. They hoped that Hicks would consent to the search. When the police knocked on the door, Peyton's girlfriend, Tyra Harvey, answered. They asked to speak with Hicks, and

Harvey told them that she was in the bedroom. While two officers waited just inside the entryway, two others entered the bedroom through its open door only a few steps away and found Hicks sitting on the bed.

The officers told Hicks that they believed there might be drugs in the apartment and wanted her permission to conduct a search. They presented Hicks with a consent form, which she signed, that stated she was freely agreeing to let the police search the entire apartment. The search began in the living room. According to one of the officers, as they came near Peyton's bed, Hicks told them that that part of the living room was "the area where [Peyton] keeps his personal property." Def.'s Ex. 6, Aff. ¶ 7, *United States v. Peyton*, Crim. No. 10-15 (D.D.C. July 22, 2010) (search warrant affidavit). One of the officers saw a closed shoebox next to Peyton's bed and picked it up. When he opened the shoebox, he smelled marijuana. Inside the shoebox, he found more than 25 grams of marijuana, 70 grams of crack cocaine, and $4000 in cash. The officers then searched the adjoining kitchen, where they discovered two plates and a razor blade covered with a white residue in the cabinets.

Relying on the evidence found in the shoebox during the July search, a grand jury issued an indictment against Peyton on January 12, 2010, for possession with intent to distribute 50 grams or more of crack cocaine and a detectable amount of marijuana. On January 20, four police officers returned to the apartment with an arrest warrant in hand. Peyton answered the door and was immediately handcuffed. A protective sweep of the apartment found Hicks in the bedroom and Harvey and an unidentified male in the living room. Smelling a strong odor of marijuana, the officers asked Hicks for permission to conduct a full search of the apartment. She agreed and signed a consent form. Present throughout the search, Peyton did not

object. The officers found crack cocaine, marijuana, and a handgun in the kitchen cabinets.

Armed with this new evidence, on January 26, 2010, the grand jury issued a superseding indictment against Peyton that restated the original charges but also added three more: possession with intent to distribute crack cocaine, possession with intent to distribute marijuana, and possession of a firearm in furtherance of a drug trafficking offense.

In the district court, Peyton moved to suppress all of the evidence discovered during the warrantless searches in July 2009 and January 2010. Hicks testified for Peyton at the hearing on his motion. The government put on one police officer to testify about the July search and another to address the January search. Hicks and the officer gave slightly different accounts of the scope of the search Hicks authorized in July. Although Hicks did not dispute that she freely signed the form, her memory was that the police had asked to search only the living room. The officer remembered that Hicks had agreed to their search of the entire apartment. Hicks and the other officer gave consistent accounts of the scope of the January search. They both remembered that Hicks had read and signed the consent form, and neither said that Hicks had limited the search's scope.

Peyton challenged both searches on the ground that "Ms. Hicks did not have common authority over the area to be searched." Transcript of Motions Hearing at 95, *United States v. Peyton*, Crim. No. 10-15 (D.D.C. July 22, 2010) (7/22/2010 Hr'g Tr.). The district court rejected this argument, concluding, as to the July search, that Hicks had authority to consent to the search of the entire apartment and that she voluntarily agreed to a search of the living room but not the kitchen. Accordingly, the district court ruled all the evidence

seized admissible except for that found in the kitchen. As to the January search, the district court found that Hicks's consent was voluntary and covered the entire apartment. All the evidence found in January was held admissible.

In the wake of the district court's decision, Peyton pled guilty to possession with intent to distribute a detectable amount of cocaine base (a lesser included offense of the charge based on the crack found in the shoebox) and the weapons charge, but he reserved the right to appeal the denial of his motion to suppress. Peyton and the government agreed to a sentence of 84 months, and the district court accepted the deal.

We have jurisdiction over Peyton's appeal under 28 U.S.C. § 1291. We review the district court's legal rulings de novo and its factual findings for clear error. *Ornelas v. United States*, 517 U.S. 690, 699 (1996); *United States v. Holmes*, 505 F.3d 1288, 1292 (D.C. Cir. 2007).

II

As to the July 2009 search, we agree with Peyton that Hicks could not lawfully permit the police to search his closed shoebox. Concluding the search was unlawful on this ground, we need not take up Peyton's other arguments that Harvey lacked authority to let the police enter in the first place and that Hicks did not voluntarily agree to the search.

A

The government contends that Peyton has waived his argument about the shoebox because he did not raise it at the suppression hearing.

An argument to suppress evidence not made before trial is waived, which means that absent good reason for not raising the argument at the district court, the appellant cannot ask us to consider the matter. FED. R. CRIM. P. 12(b)(3), (e); *cf. United States v. Weathers*, 186 F.3d 948, 957 (D.C. Cir. 1999). Given the serious consequence of waiver in a criminal proceeding, it is fitting that defendants are able to preserve a suppression argument simply by "stat[ing] the basis of their objection to the admission of the evidence" before the district court. *United States v. Mitchell*, 951 F.2d 1291, 1297 (D.C. Cir. 1991). In doing so, they "need not articulate the entire body of law relevant to their claim," *id.*, or expound their argument as "fulsomely" as they might in an appellate brief, *United States v. Hutchinson*, 268 F.3d 1117, 1121-22 (D.C. Cir. 2001).

The government acknowledges that Peyton disputed Hicks's authority to allow a search of the living room, but contends that his failure to raise the "separate issue" of Hicks's authority over the shoebox means he waived that point. Appellee's Br. 30. Our dissenting colleague agrees, *see* Dissenting Op. at 7 n.5, but we think this is too stingy a reading of what Peyton argued. At the suppression hearing, his counsel maintained that "for both searches Ms. Hicks did not have common authority over the area to be searched and therefore her consent was invalid." 7/22/2010 Hr'g Tr. 95. When asked to elaborate, his counsel explained "that that area that was searched or that the officers requested permission to search was Davon's—the Defendant's area of where he slept and kept his belongings, and it's more than that. It's—that's his home as well." *Id.* Peyton's argument was not only about the living room in its entirety. It was also about the portion of the living room that Peyton claimed and Hicks acknowledged was uniquely his. The district court recognized that Peyton's argument raised the issue of "whether [Hicks] had authority to

consent to the search of *the area where the Defendant's belongings were located*." Transcript of Motions Hearing at 11, *United States v. Peyton*, Crim. No. 10-15 (D.D.C. July 27, 2010) (emphasis added). Peyton did not need to emphasize that the evidence was inside the shoebox; that fact was obvious and undisputed.

In the end, Peyton presses the same legal theory on appeal that he raised below: Hicks lacked authority to allow the search of the place the evidence was found. The cases where we have found waiver of arguments under Rule 12, by contrast, involved defendants raising wholly new claims or switching legal theories on appeal. *See, e.g.*, *United States v. Hewlett*, 395 F.3d 458, 460 (D.C. Cir. 2005) (defendant who argued below that police lacked probable cause for warrantless arrest could not argue on appeal that arrest warrant was defective); *Mitchell*, 951 F.2d at 1297 (defendant who argued below that police lacked probable cause to search could not argue on appeal that police lacked warrant); *United States v. Bailey*, 675 F.2d 1292, 1294 (D.C. Cir. 1982) (defendants who argued below that joinder was impermissibly prejudicial could not argue on appeal that joinder violated Federal Rule of Criminal Procedure 8(b)); *see also* 6 WAYNE R. LAFAVE, SEARCH AND SEIZURE § 11.1(a), at 12-13 & n.29 (5th ed. 2012) (collecting cases). Finding no waiver of Peyton's argument, we turn to its merits.

B

"At the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." *Silverman v. United States*, 365 U.S. 505, 511 (1961). A warrantless search is the quintessential intrusion and is presumptively unreasonable. The government can rebut that presumption by

showing that the police, despite lacking a warrant, were permitted to undertake the search by someone with authority. *See Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990). Such consent need not come from the target of the search. It may come from "a third party who possesse[s] common authority over . . . the premises or effects sought to be inspected." *United States v. Matlock*, 415 U.S. 164, 171 (1974). "Common authority" does not refer to some kind of "technical property interest." *Georgia v. Randolph*, 547 U.S. 103, 110 (2006). It arises simply from

> mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.

*Matlock*, 415 U.S. at 171 n.7. Even a person who does not *actually* use the property can authorize a search if it is reasonable for the police to believe she uses it. *See Rodriguez*, 497 U.S. at 186. Such "apparent authority" is sufficient to sustain a search because the Fourth Amendment requires only that officers' factual determinations in such situations "always be reasonable," "not that they always be correct." *Id.* at 185. We review de novo whether an officer's belief that a consenting individual has actual authority is reasonable. *United States v. Law*, 528 F.3d 888, 904 (D.C. Cir. 2008) (per curiam).

The fact that a person has common authority over a house, an apartment, or a particular room, does not mean that she can authorize a search of anything and everything within that area. As we held in *Donovan v. A.A. Beiro Construction Co.*, "While authority to consent to search of a common area

extends to most objects in plain view, it does not automatically extend to the interiors of every enclosed space within the area." 746 F.2d 894, 901-02 (D.C. Cir. 1984); *see also United States v. Karo*, 468 U.S. 705, 725 (1984) (O'Connor, J., concurring in part and concurring in the judgment) ("A homeowner's consent to a search of the home may not be effective consent to a search of a closed object inside the home."). This principle flows logically from the way people live in shared spaces. Two may agree to share a room, such that neither could object to the other allowing a third party to enter, but they often retain private interior spaces—a closet, a footlocker, a dresser drawer—that they do not let the other use and that they do not assume the other will allow a third party to inspect. *See United States v. Davis*, 332 F.3d 1163, 1169 n.4 (9th Cir. 2003) ("By staying in a shared house, one does not assume the risk that a housemate will snoop under one's bed, much less permit others to do so.").

At first, this limitation on the scope of common authority might seem to put the police in a bind. Must an officer, having determined that a person has common authority over an apartment, separately confirm her authority over every closed container in the apartment before relying on her consent to conduct a search? No, for in many instances the person's common authority over the larger area (say, the living room) will make it reasonable for the police to believe that she shares use of its closed containers (say, the drawers of the television stand). She will have apparent authority over those spaces. This is the same point we made in *Donovan*, where we explained how to identify the types of containers over which common authority appears to extend: "The rule has to be one of reason that assesses the critical circumstances indicating the presence or absence of a discrete expectation of privacy with respect to the particular object: whether it is secured, whether it is commonly used for preserving privacy,

etc." 746 F.2d at 902 (quoting *United States v. Block*, 590 F.2d 535, 541 n.8 (4th Cir. 1978)); *see also United States v. Basinski*, 226 F.3d 829, 834-35 (7th Cir. 2000) (using similar factors in analyzing apparent authority over closed containers).

The district court's conclusion that Hicks had common authority over the living room generally does not answer the critical question here: Did she have authority over the shoebox?[1] There is no evidence that Hicks either shared use of the shoebox with Peyton or had permission to do so, and the government does not argue that she had actual authority. Instead, the government invokes *Donovan* to suggest that Hicks had *apparent* authority, emphasizing three circumstances that suggest Peyton did not retain a privacy interest in the shoebox. The living room where he slept remained a common area, with a diminished expectation of privacy for things left there. Peyton took no special steps to hide or protect the shoebox. And a shoebox is not "the type of container that has historically been accorded the highest privacy expectations." Appellee's Br. 34.

---

[1] The fact that the district court thought it was sufficient to address only the room as a whole does not mean Peyton's argument below must have concerned only the room as a whole. *See supra* at 6-7; *cf. Block*, 590 F.2d at 540 & n.7 ("Our review of the district court's order makes it apparent that the court concluded that once authority to search the room itself was found, that authority extended to the interior of the footlocker in the room. . . . The decisive error, of course, and the one precisely under review here, is the ultimate conclusion that authority existed to consent to search of the footlocker, by whatever intermediate steps of reasoning it was reached.").

Standing alone, these circumstances might suggest that the shoebox was not a private space and that it was reasonable for the police to believe that Hicks's authority over the living room also encompassed the shoebox. But these were *not* the only circumstances the police were aware of. They knew that Hicks and Peyton both lived in the small apartment, and they were thus on notice that some spaces in the apartment might be used exclusively by Peyton. Indeed, the officer who opened the shoebox had been inside the apartment during the earlier warrant search and knew that Peyton's bed was in the living room. But most critically, according to the sworn account of that very officer, Hicks told the police that Peyton kept his "personal property" in the area around the bed, where the shoebox was found. In light of this clear statement that there was an area of the room that was not hers, it was not reasonable for the police to believe that Hicks shared use of the closed shoebox. Hicks lacked apparent authority to consent to its search. *Cf. United States v. James*, 353 F.3d 606, 615 (8th Cir. 2003) ("It cannot be reasonable to rely on a certain theory of apparent authority, when the police themselves know what the consenting party's *actual* authority is . . . .").

Our decision in *United States v. Whitfield*, 939 F.2d 1071 (D.C. Cir. 1991), bolsters our conclusion. In *Whitfield*, FBI agents investigating a bank robbery sought a mother's permission to search her adult son's bedroom in the family home. *Id.* at 1072-73. The district court ruled that the mother had apparent authority to allow the search. We reversed, holding that the mother had not told the agents enough about her use of the son's room for them reasonably to believe she had common authority:

> [T]he government's burden to establish that a third party had authority to consent to a search . . . cannot be met if

agents, faced with an ambiguous situation, nevertheless proceed without making further inquiry. If the agents do not learn enough, if the circumstances make it unclear whether the property about to be searched is subject to "mutual use" by the person giving consent, "then warrantless entry is unlawful *without further inquiry*."

*Id.* at 1075 (quoting *Rodriguez*, 497 U.S. at 188-89) (emphasis added in *Whitfield*). Apparent authority does not exist where it is uncertain that the property is in fact subject to mutual use.[2] Hicks's statement that Peyton kept his personal property in the area around the bed did more than create such uncertainty: it strongly suggested she did *not* use the shoebox or have permission to do so. The police should not have searched the shoebox without first making further inquiry to determine whether Hicks had authority. *See United States v. Taylor*, 600 F.3d 678, 680-85 (6th Cir. 2010) (concluding that resident did not have apparent authority to consent to search of shoebox in spare-bedroom closet where circumstances created ambiguity regarding mutual use).

Some circuits have not followed *Whitfield*'s logic that ambiguity is enough to defeat apparent authority in cases involving closed containers in shared spaces. *See Taylor*, 600 F.3d at 685-86 (Kethledge, J., dissenting) (noting divergent approaches to consent searches of closed containers). The Seventh Circuit, for instance, has concluded that the risk of uncertainty in these situations should be borne by the defendant, not the police. A person with common authority over the premises is presumed to have authority over closed containers found there unless the police receive "positive information" to the contrary. *United States v. Melgar*, 227

---

[2] It is this principle that makes *Whitfield* so important, not its factual similarity to this case. *Cf.* Dissenting Op. at 4-5.

F.3d 1038, 1041 (7th Cir. 2000). Similarly, the Second Circuit has held that a lessee has authority to consent to the search of all closed containers within an apartment except those that "obviously" belong to someone else. *United States v. Snype*, 441 F.3d 119, 136 (2d Cir. 2006). But even these standards would not compel a different outcome here. Hicks's statement to the officers, combined with their knowledge of the shared living arrangement between Peyton and Hicks, was "positive information" that arguably made it "obvious" that the closed shoebox belonged specifically to Peyton.

Nor is our conclusion that Hicks lacked authority undermined by *United States v. Harrison*, 679 F.2d 942 (D.C. Cir. 1982). In *Harrison*, the defendant's wife discovered boxes of marijuana in an area of their basement that both used to store personal items. She called the police and asked them to remove the marijuana, which they did without a warrant. *Id.* at 945, 947. When the defendant sought to suppress the evidence, we held that, under the Supreme Court's reasoning in *Matlock*, the wife's common authority over the basement storage area gave her "full authority to release the boxes of marijuana into police custody." *Id.* at 947. *Harrison*'s reasoning on this point is not entirely clear, in part because the opinion does not distinguish between actual and apparent authority, but *Whitfield* viewed *Harrison* as turning on the notion that it was reasonable for officers to assume that a husband and wife would share use of the storage area. *See Whitfield*, 939 F.2d at 1074-75 (citing *Harrison*). But just as a comparable assumption of mutual use was not warranted in *Whitfield* itself, so it is not warranted here. The closed shoebox was not located in a storage area shared by a husband and wife; it was next to the defendant's bed,[3] in an area his

---

[3] Unlike our dissenting colleague, we consider this an important fact that makes the case for apparent authority much

great-great-grandmother described as containing his "personal property." Under these very different circumstances, it was not reasonable for the police to believe that Hicks had the necessary authority. Accordingly, the evidence recovered from the shoebox must be suppressed.

Our dissenting colleague argues that under *Matlock*, Peyton assumed the risk of this search. *See* Dissenting Op. at 9-10. We take a narrower view of the risk he assumed. To be sure, Peyton assumed the risk that Hicks would permit outsiders (including the police) into the room where he slept, and he thereby also assumed the risk that those outsiders would see any of his possessions left in plain view. Thus, had Peyton left a handgun lying atop his bed, we would not require its suppression. But it does not follow that Peyton also assumed the risk of Hicks's permitting outsiders to rummage through his closed containers to discover items *not* in plain view. The dissent suggests that, under *Donovan*, it is enough that the shoebox itself was in plain view. *See* Dissenting Op. at 9. We think that misreads the key sentence of *Donovan*— quoted in full above, at 8-9—which distinguishes between "objects in plain view" and "the interiors of . . . enclosed space[s]." *Donovan*, 746 F.2d at 901-02; *see also United States v. Rodriguez*, 888 F.2d 519, 523-24 (7th Cir. 1989) ("Many a closed container is accessible; [but] opening it requires justification . . . . Why a lack of privacy in the room implies a lack of a privacy interest in the contents of the containers remains a mystery.").

The dissent also contends we have put cotenants like Hicks, who *want* the police to remove any contraband in a shared dwelling, in an untenable position. *See* Dissenting Op.

---

weaker than if the shoebox had been, say, sitting by itself in the middle of the room.

at 8-9. We respectfully disagree. It cannot be that a cotenant's *desire* that the police remove any contraband creates in her common authority that does not otherwise exist. The mother in *Whitfield* would not have had the necessary authority simply by telling the agents that she ardently wished them to confiscate any evidence of her son's wrongdoing. Moreover, our ruling does not leave cotenants like Hicks helpless: "The co-tenant acting on his own initiative may be able to deliver evidence to the police, *Coolidge* [*v. New Hampshire*, 403 U.S. 443, 487-489 (1971)] (suspect's wife retrieved his guns from the couple's house and turned them over to the police), and can tell the police what he knows, for use before a magistrate in getting a warrant." *Georgia v. Randolph*, 547 U.S. 103, 116 (2006).

Finally, there is nothing in the Supreme Court's recent decision in *Fernandez v. California*, 134 S. Ct. 1126 (2014), that is inconsistent with our ruling. In that case, police sought to enter an apartment shared by Fernandez and his girlfriend, Roxanne Rojas, but Fernandez objected. The police then removed Fernandez and lawfully arrested him. Roughly an hour later, the police returned, obtained Rojas's consent to search the apartment, and discovered various pieces of evidence later used against Fernandez. *Id.* at 1130-31. Fernandez challenged the search solely on the ground that, under *Georgia v. Randolph*, his earlier objection barred the subsequent consent search. *Id.* at 1131. The Court disagreed, holding that *Randolph* is limited to cases where, earlier objections notwithstanding, an objecting cotenant is physically present at the time police ask to search. *Id.* at 1134-37. That holding has no bearing on our case, which does not involve an objecting cotenant. Our case concerns the scope of a cotenant's common authority, an issue not addressed in *Fernandez* for a simple reason: Fernandez never disputed that Rojas had the necessary common authority. *Id.* at 1138

(Thomas, J., concurring) ("[P]etitioner does not contest that Rojas had common authority over the premises."); *see also People v. Fernandez*, 145 Cal. Rptr. 3d 51, 58 (Cal. Ct. App. 2012) (no challenge to Rojas's authority). *Fernandez* thus says nothing that undermines our analysis of Hicks's authority.

## III

As to the January 2010 search, Peyton asserts that the drugs and gun seized from the kitchen should have been suppressed because they are "fruit of the poisonous tree" of the July searches of the kitchen and shoebox. Under this venerable doctrine, evidence that would likely not have been found but for a Fourth Amendment violation must usually be suppressed. *See generally United States v. Holmes*, 505 F.3d 1288, 1292-94 (D.C. Cir. 2007). First, as Peyton sees it, the police would not have sought Hicks's consent to conduct a search of the kitchen in January without first having discovered the plates and razor blades in the kitchen cabinets during the portion of the July search that the district court found unlawful. Although we can understand why Peyton would try to take advantage of this finding (which the government did not appeal), we reject this argument, for we agree with the government that it strains credulity to think this was the reason for the January search of the kitchen. It seems far more likely, simply as a matter of sound police work, that the officers would have wanted to search the kitchen of a suspected drug dealer regardless of whether they had discovered evidence there before.

Peyton's better argument is that the evidence seized in January is tainted by the illegal search of the shoebox in July. The causal chain seems direct: the evidence discovered in the shoebox was the basis for Peyton's indictment; the indictment

led to the arrest warrant; and it was during the execution of the warrant that the officers sought and received Hicks's consent to search the kitchen. Even so, we decline to decide in the first instance whether the evidence seized in January is the fruit of the unlawful search of the shoebox. We are a court of review, not of first view, and the district court, having concluded that the July search of the shoebox was legal, had no occasion to address this issue. We therefore vacate the portion of the district court's order relating to the evidence seized in January and remand to let the district court have the first opportunity to address the matter, and, if it deems appropriate, to conduct additional fact-finding to supplement the record. *See, e.g.*, *United States v. Hill*, 649 F.3d 258, 270 (4th Cir. 2011); *United States v. Valentine*, 539 F.3d 88, 96 & n.10 (2d Cir. 2008). Our decision to remand is bolstered by how little space the parties devoted to this issue in their briefs. Both parties should have the opportunity to develop their arguments more fully before the district court.

If, on remand, the district court concludes there is a causal connection, it will likely need to address whether Hicks's consent to the January search was "an act prior to discovery of the challenged evidence sufficient 'to purge the primary taint' and break the causal chain between the illegal government conduct and the evidence's ultimate discovery." *Holmes*, 505 F.3d at 1294. The district court should be guided by *Holmes*. There we noted that consent can purge the taint of police misconduct only if it is voluntary and not the product of "exploitation" of the earlier illegality. *Id.*; *see also* 4 LaFave, *supra*, § 8.2(d), at 101-04 & n.133. In determining whether the police exploited the illegal shoebox search, the district court should consider the temporal proximity between that search in July and the discovery of the evidence in January, the presence of intervening circumstances, and, most importantly, the "purpose and flagrancy" of the illegal

shoebox search. *See Holmes*, 505 F.3d at 1294 (citing *Brown v. Illinois*, 422 U.S. 590, 603-04 (1975)).

## IV

Federal Rule of Criminal Procedure 11 permits a defendant who has entered a conditional guilty plea to withdraw that plea if he "prevails on appeal." FED. R. CRIM. P. 11(a)(2). Our decision to suppress the evidence in the shoebox undermines the first two charges in the superseding indictment, possession with intent to distribute crack cocaine and marijuana, respectively. The former was one of the two charges to which Peyton pled guilty. As such, we think there is a high "probability that the excluded evidence would have had a material effect on [Peyton's] decision to plead guilty" and therefore conclude that he is entitled to withdraw his plea. *United States v. Leake*, 95 F.3d 409, 420 n.21 (6th Cir. 1996); *accord United States v. Latz*, 162 F. App'x 113, 121 (3d Cir. 2005) ("[A] defendant 'prevails on appeal' only when he persuades the Court of Appeals to exclude a piece of evidence that is material to his case."). Accordingly, upon the district court's resolution of the remaining suppression issue, Peyton may choose whether to withdraw his guilty plea. If he does so, the government remains free to reinstate the charges it dismissed pursuant to the plea agreement as that agreement allows.

*So ordered.*

KAREN LeCRAFT HENDERSON, *Circuit Judge*, dissenting:

I disagree with the majority's conclusion that Davon Peyton's great-grandmother Martha Mae Hicks lacked authority to consent to the July 14, 2009 search of the shoebox found lying on the living room floor of the apartment she and Peyton shared.[1] Hicks plainly had not only apparent but actual authority to consent to a search of the common living room and its contents, including the shoebox. Accordingly, I dissent from the majority's decision and would affirm the district court's judgment.[2]

I believe the district court correctly concluded that Hicks's consent to search the apartment, including the living room, was valid because "she possessed common authority over the entire apartment." Transcript of Motions Hearing 100, *United States v. Peyton*, Crim. No. 10-15 (D.D.C. July 22, 2010) (7/22/2010 Hr'g Tr.) (citing *United States v. Matlock*, 415 U.S. 164 (1974)); *see* G*eorgia v. Randolph*, 547 U.S. 103, 106 (2006) ("The Fourth Amendment recognizes a valid warrantless entry and search of premises when police obtain the voluntary consent of an occupant who shares, or is

---

[1] In district court, Hicks was referred to as Peyton's "grandmother" or great-grandmother, although he now characterizes her as his great-great-grandmother. *See* Br. for Appellant at 4 n.2.

[2] I thus see no need to address Peyton's argument that the January 2010 search was unlawful as tainted by the July 14, 2009 search. *See* Majority Opinion (Maj. Op.) at 16-18. I would also affirm the district court's other holdings regarding the July 14, 2009 search because Peyton's girlfriend Tyra Harvey, as a guest, had authority to open the apartment door to the police and the district court did not clearly err in finding Hicks's consent to the apartment search was voluntary. *See* 4 Wayne R. LaFave, *Search and Seizure* § 8.5(e) (5th ed. 2012) (authority of guest to open door to police); *United States v. Wilson*, 605 F.3d 985, 1027 (D.C. Cir. 2010) (clear error standard for voluntariness of consent).

reasonably believed to share, authority over the area in common with a co-occupant who later objects to the use of evidence so obtained." (citing *Illinois v. Rodriguez*, 497 U.S. 177 (1990); *United States v. Matlock*, *supra*)). Regarding the living room in particular, the court found that "[t]he fact that it could be said that [Peyton] used the living room as a bedroom doesn't detract from the fact that it was also the living room in the apartment and that they shared common authority over both the living room and the kitchen and the single bathroom." 7/22/2010 Hr'g Tr. 100. This finding—which the majority does not gainsay—is not clearly erroneous. *See United States v. Wilson*, 605 F.3d 985, 1027 (D.C. Cir. 2010). The living room was to all appearances a common area (as a "living room" by customary usage generally is) notwithstanding Peyton used it "as a place for sleeping, at least on occasion," 7/22/2010 Hr'g Tr. 43 (stipulation by parties); it offered the only access to the kitchen and Peyton's purported personal living area within the living room was not specifically demarcated. The particular "circumstances" the government cited to support the room's common nature (as the majority recites them)—that the living room "remained a common area, with a diminished expectation of privacy for things left there" and that Peyton "took no special steps to hide or protect the shoebox[, which] is not 'the type of container that has historically been accorded the highest privacy expectations' "—do indeed "suggest that the shoebox was not a private space and that it was reasonable for the police to believe that Hicks's authority over the living room also encompassed the shoebox." Majority Opinion (Maj. Op.) at 10-11 (quoting Br. for Appellee at 34).

As the majority correctly recites, the officers searching the apartment "knew that Hicks and Peyton both lived in the small apartment"—this is precisely the circumstance that gave each of them shared authority over the common areas—and,

in light of Peyton's age and relationship to Hicks, that the police "were thus on notice that *some* spaces in the apartment *might* be used exclusively by Peyton." *Id.* at 11 (emphases added); *cf. United States v. Whitfield*, 939 F.2d 1071, 1075 (D.C. Cir. 1991) (noting parents may (or may not) "permit their adult sons and daughters to have exclusive use of the rooms they occupy").

Where the majority strays, however, is in its assertion that Hicks made a "clear statement that there was an area of the [living] room that was not hers." Maj. Op. at 11. The sole evidence the majority offers of the "clear statement" that Hicks had ceded authority over some amorphous "area of the room" is the recital in a later search warrant affidavit signed by one of the searching officers that the officer "went to a bed in the apartment's living room"[3] and "Hicks identified this as the area where Mr. Peyton keeps his personal property." Def.'s Ex. 6, Aff. ¶ 7, *United States v. Peyton*, Crim. No. 10-15 (D.D.C. July 22, 2009) (JA 60). To derive from this simple (yet vague) account of Hicks's words that there was some "portion of the living room that Peyton claimed and Hicks acknowledged was *uniquely* his," Maj. Op. at 6 (emphasis added)—and from which Hicks herself was therefore excluded (or at least deprived of authority thereover)—is a stretch too far. Moreover, Hicks herself asserted authority over the entire apartment. The consent form she signed authorized the officers "to conduct a

---

[3]Although the search warrant affidavit refers to a "bed," the officer who testified at the evidentiary hearing "d[id not] recall if there was a bed or couch" but " believe[d] there was a couch that was there." 7/22/2010 Hr'g Tr. 42. The government referred to it below as a "daybed." Gov't's Opp'n to Def.'s Mot. to Suppress Tangible Evidence 1, Transcript of Motions Hearing at 8, *United States v. Peyton*, Crim. No. 10-15 (D.D.C. July 27, 2010) (7/27/2010 Hr'g Tr.).

*complete* search of [her] premises" and, after signing the form, Hicks instructed the officers: "This is my house and if Davon has anything illegal in here I want you to take it." Gov't Ex. 6 (signed consent form); Def.'s Ex. 6 ¶ 6 (search warrant affidavit) (emphasis added), *United States v. Peyton*, Crim. No. 10-15 (D.D.C. July 22, 2009) (JA 55, 60). None of these circumstances makes it even "arguably . . . 'obvious' that the closed shoebox belonged *specifically* to Peyton." Maj. Op. at 13 (emphasis added).

Nor is the precedent the majority cites convincing. In *United States v. Whitfield*, 939 F.2d 1071 (D.C. Cir. 1991), the majority's principal authority, the court faced a far different factual situation. There, government agents had seized evidence (stolen cash) from the pockets of four coats hanging in the clothes closet opening off the defendant's second floor bedroom in his mother's house, after they obtained the mother's consent to search the bedroom. The court concluded that "[a]s a factual matter, the agents could not reasonably have believed Mrs. Whitfield had authority to consent to th[e] search" because they "simply did not have enough information to make that judgment." 939 F.2d at 1074. The court explained that, assuming the agents had reason to believe the mother, as a resident of the house, " 'generally' had 'joint access' " to her son's unlocked bedroom, her "ability, or even legal right, to enter simply qualified her as a person who . . . could give consent to a search of property subject to her 'mutual use,' "—"whether she had 'mutual use' of the room or the closet containing the defendant's clothing could not be determined" given "[t]he bedroom itself was not a 'common area' and the agents had no grounds for believing otherwise." *Id.* (quoting *Matlock*, 415 U.S. at 171 n.7, q.v. ("The authority which justifies the third-party consent . . . rests . . . on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the

co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.")). The "ambiguous situation" in *Whitfield* was whether the adult son's separate bedroom, which was plainly "not a 'common area,' " and the adjoining closet—accessible only through the bedroom and containing the son's clothing in which the contraband was found—constituted "his private enclave." *Id.* at 1075. There was no such ambiguity regarding the common living room here; the disputed area was indeed indistinguishable from the rest of the open living room space which was "common" not only because it was the "living room" but also because it constituted the sole pathway to the kitchen. That Peyton slept in the room "on occasion" and "ke[pt] his personal property" there did not transform the room—or some unmarked and undefined area within it—into his personal preserve to the exclusion of Hicks and her belongings. Without some indication from Hicks that the shoebox was off-limits to her, the officers were not "faced with an ambigu[ity]" different from that attaching to any property in any common area shared by more than one resident.[4]

The situation here more closely resembles *United States v. Harrison*, 679 F.2d 942 (D.C. Cir. 1982). In *Harrison*, the defendant's wife (Mrs. Harrison) had invited police officers to the house she shared with the defendant and asked them to remove "two large unsealed boxes containing seventeen packages of marijuana" she had found "in a storage area used by both her and [the defendant] under the basement stairwell." *Id.* at 945. We affirmed the district court's denial of the defendant's motion to suppress the marijuana because Mrs.

---

[4]Indeed, the majority makes Hicks's guiding the officers to the area of the living room where Peyton slept and "kept his stuff" tantamount to a declaration that she surrendered her use thereof.

Harrison "had full authority to release the boxes of marijuana into police custody, viz., she fit[] fully within the 'common authority' criteria enunciated in *Matlock*." *Id.* at 947. The court explained:

> Mrs. Harrison had full "common authority" to the storage area in the basement. That area was unlocked and open, and contained personal items that belonged to both appellant and his wife. The boxes were not sealed or taped and were closed only by "criss-crossed" flaps. Moreover, the record provides no indication that the boxes were marked in any way indicating appellant's ownership. Nor is there anything in the record to indicate that appellant ever asserted that the boxes were exclusively in his control or even that they were his personal effects.

*Id.* Like the boxes in *Harrison*, the shoebox here was found in plain sight, unsealed and unmarked, within a shared common area. Nothing about the box itself suggested it was private, much less exclusive to Peyton. Nor does the record indicate that Hicks's "common authority" over the living room had been partitioned to exclude the box or the area of the floor where it was found. Armed with the consent of co-resident Hicks to search the entire living room—without any express reservation—the searching officers could reasonably believe, at a minimum, that her authority to consent reached the shoebox lying in plain view on the living room floor. *See Illinois v. Rodriguez*, 497 U.S. 177, 186 (1990) ("Whether the basis for [the authority to consent to a search] exists is the sort of recurring factual question to which law enforcement officials must be expected to apply their judgment; and all the Fourth Amendment requires is that they answer it reasonably."). They were entitled to "proceed on the basis of the 'factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians,

act.' " *Whitfield*, 939 F.2d at 1074 (quoting *Brinegar v. United States*, 338 U.S. 160, 175 (1949)). Thus, they could "assume" that co-residents great-grandmother and great-grandson, like husband and wife in *Harrison*, "mutually use the living areas in their residence and have joint access to them so that either may consent to a search." *Whitfield*, 939 F.2d at 1074-75 (citing *Harrison*, 679 F.2d at 946-47). The officers were not required to engage in "metaphysical subtleties" to carve out a separate but undefined room-within-a-room that was reserved to Peyton's exclusive use and dominion. *See Frazier v. Cupp*, 394 U.S. 731, 740 (1969) (declining to "engage in such metaphysical subtleties in judging the efficacy of [defendant's cousin's] consent" to search duffel bag as would be required under defendant's theory that cousin "only had actual permission to use one compartment of the bag and that he had no authority to consent to a search of the other compartments").[5]

One fact the majority completely ignores is to me critical to a common sense review of the challenged search.

---

[5]Even were Peyton's room-within-a-room theory persuasive, I would find it forfeited because he failed to articulate it to the district court. *See United States v. Vinton*, 594 F.3d 14, 24 (D.C. Cir. 2010); *United States v. Redman*, 331 F.3d 982, 986 (D.C. Cir. 2003). The argument Peyton offered below—that Hicks lacked authority to consent to the search of the living room as a whole, which is a discrete, albeit common unit of the apartment—is quite different from the more complex argument he raises now—that she lacked authority to consent to a search of some specific area within the room—where Peyton slept and kept his belongings or the contents of that area. *Cf. Vinton*, 594 F.3d at 24 (appellant who argued in district court that officer lacked probable cause based on facts uncovered during investigative stop waived argument on appeal challenging probable cause finding based on supporting facts having been obtained only after investigative stop was extended beyond reasonable duration).

According to the record, the 85-year-old Hicks, shaking her head, told the officers: "This is my house and if Davon has anything illegal in here I want you to take it." Def.'s Ex. 6 ¶ 6, *supra*, p. 4. When a law abiding citizen, especially an elderly one, asks the police to remove contraband from her home, what would my colleagues have the police do? Wait until the undesirables who inevitably show up where drugs are kept do her some harm? Or until Peyton himself, high on cocaine, sets fire to the apartment? The notion that a citizen cannot rid her home of contraband by askin*g* the police to do so and, in aid thereof, helping the officers in their search by indicating a likely location—but instead must be told: "Sorry, Ma'am, we can't do that without your establishing that you have use and control of every inch of the living room."—is on its face senseless. It also flies in the face of Fourth Amendment jurisprudence as most recently expounded by the United States Supreme Court in *Fernandez v. California*, 134 S. Ct. 1126 (2014).

In *Fernandez*, the Supreme Court affirmed the rule that "consent by one resident of jointly occupied premises is generally sufficient to justify a warrantless search." *Id.* at 1133. Following this rule, the Court upheld the search of an apartment to which resident Roxanne Rojas consented approximately one hour after co-resident Walter Fernandez expressly refused the police entry to search, whereupon he was arrested on suspicion of domestic assault and taken to the police station for booking. The Court narrowly construed the exception to the co-resident consent rule carved out in *Georgia v. Randolph*, which prohibits a search if a second co-resident objects thereto—"accept[ing] *Randolph* on its own terms" to "unequivocally require[] the presence of the objecting occupant." *Id.* at 1134-35. "Putting the exception the Court adopted in *Randolph* to one side," the Court instructed, "the lawful occupant of a house or apartment should have the right to invite the police to enter the dwelling

and conduct a search." *Id.* at 1137. "Any other rule would trample on the rights of the occupant." *Id*. In particular, the Court advised, "an occupant may want the police to conduct a thorough search so that any dangerous contraband can be found and removed," noting that in *Fernandez* "the search resulted in the discovery and removal of a sawed-off shotgun to which Rojas' 4-year-old son had access." *Id*. at 15. In this case, Hicks consented to the police search of the living room for the express purpose of removing contraband from her apartment—a reasonable request the majority would have the police—and this court—ignore. Her guidance to the police, as I note below, did not affect the scope of her authority to consent to the search.

It is true, as the Majority observes, that the mere "desire" to remove contraband "cannot . . . create[] . . . common authority that does not otherwise exist." Maj. Op. at 15. The majority does not dispute, however, that Hicks had authority, as the district court found, to consent to a search of the common living room, *see supra* p. 2, which authority "extends to most objects in plain view"—including the seized shoebox. *Donovan v. A.A. Beiro Constr. Co.*, 746 F.2d 894, 901-02 (D.C. Cir. 1984). "The touchstone of *Matlock's* third party consent analysis is that any reasonable expectation of privacy in common areas is lost once joint occupants assume the risk that a co-occupant will allow access to the common areas." *Id*. at 899. Peyton assumed just such a risk and, accordingly, had no reasonable expectation of privacy in the shoebox that he left lying unmarked and unsecured on the floor, visible and accessible to Hicks and to anyone Hicks might invite into their shared living room—including the police. *See id*. at 902 (To determine whether a reasonable expectation of privacy exists, we apply a "rule . . . of reason that assesses the critical circumstances indicating the presence or absence of a discrete expectation of privacy with respect to the particular object: whether it is secured, whether it is

commonly used for preserving privacy, etc." (quoting *United States v. Block*, 590 F.2d 535, 541 n.8 (4th Cir. 1978) (noting: "Obviously not every 'enclosed space' within a room or other area—*e.g.* pockets in clothes, unsecured shoeboxes, and the like—can claim independent status as objects capable of search not within reach of the authorized area search."))). I do not see how Peyton's privacy expectation could possibly be revived by anything that Hicks said to the officers. The Supreme Court's concern expressed in *Fernandez* only highlights Hicks's right, as a lawful occupant of the apartment, to enlist police assistance to remove illegal drugs from the living room she and Peyton shared. She should not, as the majority suggests, be reduced to self-help to evict from her home the drug trafficking culture Peyton has invited in. Such a rule would "trample on [her] rights." *Fernandez*, 134 S. Ct. at 1137.[6]

The majority and I have together written almost 30 pages—not only to decide this case but also to guide a constituency made up in large part of police officers, trial judges and the bar. My colleagues rely on the common sense language of *Whitfield* that an officer "*faced with an ambiguous situation*" must make further inquiry before concluding that "the property about to be searched is subject to 'mutual use' by the person giving consent." Maj. Op. at 12 (quoting 939 F.2d at 1075 (quoting *Rodriguez*, 497 U.S. at

---

[6]In *Fernandez*, the Court rejected the petitioner's argument that his objection to the search should remain effective until withdrawn in part because such a rule "would create the very sort of practical complications that *Randolph* sought to avoid," noting that *Randolph* "adopt[ed] a 'formalis[tic]' rule, but it did so in the interests of 'simple clarity' and administrability." 134 S. Ct. at 1135 (quoting *Randolph*, 547 U.S. at 121, 122).

188-89)).[7] At the same time, they appear to recognize that "this limitation on the scope of common authority might seem to put the police in a bind." *Id*. at 9. But then, distinguishing between the shoebox and "say, the drawers of the television stand," *id*., both of which are located in a mutual use living room, they conclude that the officers' search of the drawers would be reasonable but that the shoebox is verboten. On the basis of a distance of no more than a few feet, then, they have decided whether or not property is subject to mutual use. How this measuring-stick jurisprudence is supposed to assist those who look to us for guidance wholly escapes me. Accordingly, I respectfully dissent.

---

[7]As already noted, *supra* p. 5, there was no ambiguity surrounding Hicks's authority to consent.